847 A.2d 628 (2004)
368 N.J. Super. 587
Robert J. TRIFFIN, Plaintiff-Respondent,
v.
AMERIPAY, LLC, Defendant-Appellant, and
Rayshawn M. Williams, Jaquin Lamar Hammouns, Linda Hall, and Rasul T. Brazell, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued March 10, 2004.
Decided May 13, 2004.
Terry E. Thornton argued the cause for appellant (O'Brien Thornton, attorneys; Merrill M. O'Brien and Ms. Thornton, on the brief).
Robert J. Triffin, respondent, argued the cause pro se.
Before Judges KESTIN, AXELRAD and LARIO.
The opinion of the court was delivered by AXELRAD, J.T.C. (temporarily assigned).
Defendant, Ameripay, LLC, a payroll services company for Nu Tribe Radio Networks, Inc. (NTRN) appeals from a judgment entered, following a bench trial, in favor of plaintiff, Robert Triffin, an assignee of several dishonored payroll checks. The issue before us is not whether a holder in due course who purchases dishonored checks has recourse against the drawer of the dishonored checks but, rather, the identification of the drawer who *629 should be held liable. More specifically, the novel issue is whether a payroll services company that opened an account and signed and issued the checks in its representative capacity should be held liable for payment of the dishonored checks, rather than the employer in whose name the checks were drawn and whose identity and location were fully disclosed on the face of the checks. We hold that the Uniform Commercial Code (UCC) imposes liability for the dishonored checks on the disclosed principal, not the agent. Accordingly, we reverse.
The testimony at trial was as follows. As a payroll services company, Ameripay determines withholding obligations, calculates amounts required to be withheld, and issues payroll checks to employees of its clients. It also handles related tax filings for the employer. In July 2002, NTRN, a company located in New York City, retained Ameripay to perform payroll services. Under its agreement, Ameripay established an account on behalf of NTRN for all amounts required to be paid for employee compensation. NTRN wired funds to the account as necessary to cover its payroll obligations, and Ameripay issued payroll checks from the account to NTRN's employees. No Ameripay funds or funds of other clients were commingled in the NTRN account. Paul Bultmeyer, one of Ameripay's partners, testified as to the arrangement:
[T]he situation is that the client funds this account, this is not an account that is funded by us. It's an account that we establish as an agent, if you will, for the client to pay their payroll, and it's their obligation to fund it. When they fail to fund it, and a check or direct deposit is returned, ... the client would have to pay it if it's paid at all, because we don't pay it.
According to Bultmeyer, in accordance with its standard practices, Ameripay opened an account at Commerce Bank as an agent for NTRN, bearing account number XXXXXXXXXX. As part of the bank's standard operating procedures for opening accounts, Bultmeyer and his partner, Arthur Piacentini, the owners of Ameripay, signed an account card as authorized signatories on the account. Because all payroll functions were to be handled by Ameripay with funds provided by NTRN, no representatives of NTRN were authorized signatories or co-signers on the account. On the bank's signature card, the title of the account holder was designated as "Account Holder Name(s): Ameripay LLC Client Payroll NRN." Bultmeyer testified that "NRN" represented "Nu Tribe Radio Network."
Ameripay submitted the required certificate of authority for a limited liability company to the bank, identifying the account holder at the top of the document as "Ameripay LLC Client Payroll NRN," consistent with the signature card. Further down on the document the account holder is identified as "Ameripay, L.L.C." On the face of the checks, NTRN's name, address, and telephone number were imprinted in the top left corner. Other than Commerce Bank as the paying bank, NTRN was the only company identified on the check. The payroll checks also contained a signature line, without any identification of the status of the signatory. The identity of Ameripay is not contained anywhere on the checks except in the faint watermark, which establishes authenticity.
On or about July 26, 2002, Ameripay issued payroll checks on behalf of NTRN, signed by Piacentini, based on NTRN's authorization for electronic transfer into the account of the amount necessary to cover the checks. Four NTRN employees cashed their payroll checks at A-1 Check *630 Cashing Emporium, Inc., (A-1 Check Cashing).[1] A-1 Check Cashing then deposited the eight checks, which were returned dishonored with the notation "return to maker." According to its standard procedure, A-1 Check Cashing's employee had verified with the bank that there were sufficient funds in the account to pay the checks. The only reason Ameripay stopped payment on the checks is because it did not receive the funds from NTRN for disbursement through the NTRN account. According to Bultmeyer, Jonathan Harris, NTRN's principal, told him that NTRN's funds had been dishonored by its bank because the forms he filled out did not allow for electronic funds transfer. Harris represented that the funds were in its PNC bank account and would be transferred into the payroll account the next day.
After the checks were returned, Alex Neu, A-l Check Cashing's president, contacted a representative from NTRN and was told the funds for the checks had been placed with Ameripay. Bultmeyer relayed to Neu the information he had received from Harris about the problem with the electronic transfer and assured that Ameripay would honor the checks if it received the funds from NTRN to cover them. NTRN failed to transfer the necessary funds into the payroll account and the checks continued to be dishonored.
On August 22, 2002, A-1 Check Cashing assigned its interest in the checks to Triffin, who is in the business of purchasing dishonored negotiable instruments from licensed check cashers. See generally Triffin v. Johnston, 359 N.J.Super. 543, 821 A.2d 92 (App.Div.2003); Triffin v. Somerset Valley Bank, 343 N.J.Super. 73, 777 A.2d 993 (App.Div.2001). Triffin knew the checks had been dishonored when he purchased them from A-1 Check Cashing. Triffin commenced this action against Ameripay and the payees for collection of the dishonored checks, totaling $4400, along with pre-judgment interest and costs.[2] Triffin did not join NTRN as a defendant. Apparently, the payees were not served with the complaint and the matter was tried solely as to Ameripay.
The judge found that A-1 Check Cashing was a holder in due courseone who takes an instrument for value, in good faith, and without notice of dishonor or any defense against or claim to it on the part of any personat the time the checks were cashed. N.J.S.A. 12A:3-302a(2). Triffin acquired the same status by the assignment under the shelter provision of the UCC, which provides that "[t]ransfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course...." N.J.S.A. 12A:3-203b; Triffin v. Cigna Ins. Co., 297 N.J.Super. 199, 202, 687 A.2d 1045 (App.Div.1997) (emphasis omitted).
The judge found persuasive that the bank records identify Ameripay as the account holder. He concluded that the signature on the checks controlled, and because Ameripay's representative signed the checks, Ameripay was liable as a drawer to a holder in due course, or its assignee, for the amount of the dishonored checks. Moreover, the court adopted Triffin's argument that, as between two innocent parties, Ameripay and Triffin, the person who should be "blamed for ... [NTRN's fraud] or the one who takes the loss, is the party who initiated the action," which the court found to be Ameripay as a *631 result of Piacentini issuing and signing the checks. Accordingly, the court entered judgment in Triffin's favor for the sum of $4,609.74.
The status of Triffin as a holder in due course, although disputed by Ameripay at trial, is not an issue on appeal. On appeal, Ameripay asserts it should not be held liable for payment of the checks it issued for NTRN because it did so solely in a representative capacity as a payroll agent. We agree.
This matter is governed by Article 3 of New Jersey's version of the UCC pertaining to negotiable instruments, as implemented in New Jersey in N.J.S.A. 12A:3-101 to -605. A check is considered a draft under the Code. N.J.S.A. 12A:3-104f. A drawer includes a person who signs a check. See N.J.S.A. 12A:3-103a(3). If an unaccepted check is dishonored, the drawer is obligated to make payment to a person entitled to enforce the check. See N.J.S.A. 12A:3-414b. As the assignee of a holder in due course to the dishonored checks, Triffin is entitled to enforce the instruments against the maker. N.J.S.A. 12A:3-301; N.J.S.A. 12A:3-308b; see also Somerset Valley Bank, supra, 343 N.J.Super. at 83-84, 777 A.2d 993.
The trial judge acknowledged that he adopted in their entirety the arguments advanced by Triffin at trial. Triffin did not dispute the fact that Ameripay was an authorized representative of NTRN with the authority to issue payroll checks on its behalf. Nor did he dispute that the represented party was prominently disclosed on the face of these checks and, in fact, was the only entity identified on the checks. Triffin's arguments focused on the status of Ameripay as the sole account holder. He emphasized that the signature card and certificate of authority on file with the bank listed Ameripay, LLC as the account holder, though the account was clearly designated as a payroll account for NTRN. Most importantly, Triffin relied on the fact that the only signature on the checks belonged to Piacentini, Ameripay's managing partner. He argued, therefore, based on Piacentini's signature, that Ameripay was a drawer under N.J.S.A. 12A:3-103a(3). According to Triffin,
[U]nder the Uniform Commercial Code the only party that can be liable [on a] negotiable instrument is the party whose signature appears thereon. And in this instance as the drawer [it] would be the person who is the account holder.
The court accepted Triffin's conclusion that Ameripay was the drawer of the dishonored checks and, therefore, was liable to him for their payment.
In response to Ameripay's appeal, Triffin reiterates that this is a routine stop-payment collection action. As an assignee of a holder in due course, he contends he is entitled to recover from Ameripay the amount of the checks under: (1) N.J.S.A. 12A:3-308 (granting a holder in due course the right to enforce a dishonored instrument subject to certain personal defenses); (2) N.J.S.A. 12A:3-414 (obligating a drawer to pay the amount of a dishonored draft); and (3) N.J.S.A. 12A:4-403, comment 7 (preserving liability to a holder in due course against a drawer who stops payment on an instrument). According to Triffin, comment 7 addresses a fact pattern identical to this caseAmeripay being fraudulently induced to issue the checksand establishes that dishonor by stop-payment is not a cognizable defense against a party with the status of a holder in due course. He also cites as authority Somerset Valley Bank, supra, 343 N.J.Super. at 73, 777 A.2d 993 and Cigna, supra, 297 N.J.Super. at 199, 687 A.2d 1045. Triffin's characterization of this action as a routine stop-payment case and reliance on these sections of the UCC and *632 cases begs the question as to the liability of an agent, more specifically, a payroll services company. None of the authorities cited by Triffin or relied upon by the trial court address the liability of representatives. In the Cigna case we held that Triffin, as assignee of a holder in due course, was entitled to the holder's right to enforce the check against the issuer, even though he purchased the check with knowledge of its dishonor. Cigna, supra, 297 N.J.Super. at 202-03, 687 A.2d 1045. In the Somerset Valley Bank case we held that Triffin, again as assignee of a holder in due course, was entitled to the holder's right to enforce against the issuer of dishonored, stolen, and forged checks that appeared to be genuine. Somerset Valley Bank, supra, 343 N.J.Super. at 87, 777 A.2d 993.
The trial court's inquiry should not have ended here. It was necessary to consider other provisions of the UCC pertaining to signatures by representatives reflected in the 1995 revisions. L. 1995, c. 28, § 1, eff. June 1, 1995. The 1995 revisions must be viewed as a clarification of the general rules of liability under N.J.S.A. 12A:3-414 and other sections enacted as part of the 1961 version of the UCC. It is a well established precept of statutory construction that when several statutory provisions might apply, or might even conflict, "the more specific controls over the general." New Jersey Transit Corp. v. Borough of Somerville, 139 N.J. 582, 591, 661 A.2d 778 (1995).
The new definitional section recognizes that the drawer of a check is not limited to the signatory and defines "drawer" as "a person who signs or is identified in a draft as a person ordering payment." N.J.S.A. 12A:3-103a(3) (emphasis added). N.J.S.A. 12A:3-401(1) previously provided that "[n]o person is liable on an instrument unless his signature appears thereon." The revised version provides two instances where a person is liable on a negotiable instrument, where "the person signed the instrument" or "the person is represented by an agent or representative who signed the instrument and the signature is binding on the represented person under 12A:3-402." N.J.S.A. 12A:3-401a.
The Legislature also added § 3-402,[3] which clarified liability for the obligation to pay a negotiable instrument when the signature is that of a representative. N.J.S.A. 12A:3-402 achieves two important goals. First, the statute explicitly provides that a represented party is liable on an instrument to the same extent as a represented party would be bound on a simple contract executed by its agent, even *633 though its signature never appears on the instrument:
a. If a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract. If the represented person is bound, the signature of the representative is the authorized signature of the represented person and the represented person is liable on the instrument, whether or not identified in the instrument.
Second, the statute provides for a "representative capacity defense," in which the maker may avoid personal liability in certain instances, even where the agency is not disclosed on the face of the instrument:
b. If a representative signs the name of the representative to an instrument and the signature is an authorized signature of the represented person, the following rules apply:
(1) If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.
(2) Subject to subsection c. of this section, if the form of the signature does not show unambiguously that the signature is made in a representative capacity or the represented person is not identified in the instrument, the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument.
At trial, the evidence was undisputed that Ameripay and NTRN had formed a contractual relationship. In retaining Ameripay to administer its payroll account, NTRN explicitly or implicitly gave Piacentini authority to sign checks on its behalf and bind NTRN on the instruments. In opening the payroll account and signing and issuing payroll checks, Ameripay acted as an agent of NTRN. NTRN, not Ameripay, owed the compensation to its employees that was paid by the checks. NTRN, not Ameripay, was obligated to provide the funds to cover the checks. NTRN, not Ameripay, ordered the payments to its employees. Thus, under agency principles, NTRN would be bound for the acts that it authorized Piacentini to undertake. See generally C.B. Snyder Realty Co. v. National Newark Essex Banking Co. of Newark, 14 N.J. 146, 101 A.2d 544 (1953). Normally, a principal is responsible for the actions of an agent who is acting within the scope of his authority. Peprah v. American Suzuki Motor Corp., 257 N.J.Super. 132, 137, 608 A.2d 1 (Law Div.1992) (citation omitted). Accordingly, had Piacentini signed a simple contract instead of the checks, NTRN would have been required to perform. Thus, Piacentini's signature on the checks was an authorized signature of the represented person within the meaning of N.J.S.A. 12A:3-402a.
We need not determine whether Piacentini's signature on the checks showed "unambiguously" that it was made on behalf of NTRN or whether Ameripay was otherwise entitled to the general "representative defenses" for a negotiable instrument under N.J.S.A. 12A:3-402b. We find that Ameripay is immune from liability under the specific provisions of N.J.S.A. 12A:3-402c pertaining to checks. Subsection c, also implemented as part of the 1995 revisions *634 to the UCC, changed the statutory provisions regarding who shall be liable on a dishonored check payable from an account of a represented person and expanded a representative's defenses. The agent is no longer liable on the check simply because he or she signed for the principal. Subsection c now provides, with respect to an authorized representative who signs his or her name on a check in which the represented person is identified, an additional exception from liability as a drawer:
c. If a representative signs the name of the representative as drawer of a check without indication of the representative status and the check is payable from an account of the represented person who is identified on the check, the signer is not liable on the check if the signature is an authorized signature of the represented person.
In comment 3 to revised N.J.S.A. 12A:3-402, the drafters express a clear intent to reverse decisions that imposed liability on agents for the obligations of their principals:
3. Subsection (c) is directed at the check cases. It states that if the check identifies the represented person the agent who signs on the signature line does not have to indicate agency status. Virtually all checks used today are in personalized form which identify the person on whose account the check is drawn. In this case, nobody is deceived into thinking that the person signing the check is meant to be liable. This subsection is meant to overrule cases decided under former Article 3 such as Griffin v. Ellinger, 538 S.W.2d 97 (Texas 1976).[4]
We have not found any reported case in New Jersey interpreting these new provisions. Because we adopted the Uniform Laws, which were also adopted verbatim in most states in the United States, decisions by other states adopting revised Article 3 of the UCC, specifically § 3-402, are instructive. These cases have insulated from personal liability an authorized representative who signs a check imprinted with the corporate name, on behalf of the represented entity, where the check is returned for insufficient funds, even though the instrument does not indicate on its face that it is being signed in a representative capacity on behalf of the drawer, pursuant to UCC 3-402(c).[5]See, e.g., Medina v. Wyche, 796 So.2d 622 (Fla.Dist.Ct.App. 2001) (corporate officer is not liable to landlord for amount of dishonored corporate rent check); Helmer v. Rumarson Techs., Inc., 245 Ga.App. 598, 538 S.E.2d 504 (2000) (corporate officers are not personally liable to payee creditor for amount of dishonored corporate check); Peterson v. Holtrachem, Inc., 239 Ga.App. 838, 521 S.E.2d 648 (1999) (employee is not personally liable to payee creditor for amount of dishonored corporate check). As one prominent commentator noted, this modification of the UCC "puts the Code's legal stamp of approval on the obvious intent of the transactionthat the company's check binds only the company, even if an agent signs in her own name." Medina, supra, 796 So.2d at 623 (quoting 2 James J. White & Robert S. Summer, Uniform Commercial Code § 16-5, at 86 (4th ed. 1995)).
*635 Piacentini's signature was clearly "an authorized signature of the represented person." Ameripay's representatives, Bultmeyer and Piacentini, were given authority to issue and sign checks on NTRN's behalf. Piacentini signed the checks in this case as a representative of NTRN. While Piacentini signed his name without indicating his agency status, the name and address of NTRN, the represented entity, appear prominently in the top left-hand corner of the check, which is the customary place for identification of the drawer.
The record further supports a finding that the funds were "payable from an account of the represented person." We first note that the requirement is not that the funds be payable from an account in the name of the represented person. It is not fatal to this defense that Ameripay opened and managed the account from which the checks were issued and that Ameripay's representatives were the only signatories on the account. With regard to the UCC defenses, for all intents and purposes, NTRN is the owner of the payroll account.
On this issue, we find instructive Cohen v. Disner, 36 Cal.App. 4th 855, 42 Cal. Rptr.2d 782 (1995) in which the Court of Appeal applied UCC 3-402(b)(2) where a check was not drawn on the representative's account but on its agent's account.[6] The court held that an attorney was not liable to the payees of a check drawn on his client trust account that was dishonored when his clients stopped payment on the check they had given him. Typed on the check was a notation identifying the underlying lawsuit. The court reasoned that the attorney-signatory was a mere conduit or agent for transferring money from his clients to the payees as part of a settlement, Id. at 784, and the payees knew he was only signing in his representative capacity. Id. at 786. It was clear that the trust account check was intended to be written on funds belonging to the clients, not to the attorney, and had the clients' check been credited to the trust account, the attorney would not have been entitled to the funds for his personal use. Id. at 784 n. 2.
Although we rest our decision on N.J.S.A. 12A:3-402c rather than b, the same rationale applies. Bultmeyer's testimony, corroborated by the banking documents associated with the creation of the account, is that Ameripay held funds for NTRN in the account and maintained the account solely to satisfy NTRN's payroll obligations. The documents clearly identify the account as a client payroll account for NTRN. It is apparent that the second reference in the certificate to "Ameripay, L.L.C" as the account holder is a shorthand designation for the prior listing as "Ameripay LLC Client Payroll NRN." None of Ameripay's funds were commingled in the payroll account. The funds in the payroll account clearly belonged to NTRN, not to Ameripay. Had the electronic transfer of funds from NTRN been credited to the payroll account, neither Bultmeyer nor Piacentini would have been entitled to those funds for their personal use or for the use of Ameripay.
Moreover, our interpretation of subsection c is consistent with the spirit of this new provision as articulated in the official comment. A 1 Check Cashing, the holder in due course, was not deceived into thinking that Piacentini, as signatory on the check, or his LLC, Ameripay, was meant to be liable.
Based on the documents themselves, there was ample basis to assume they *636 were payroll checks from NTRN to its employees and the checks were intended to be written on funds belonging to NTRN. Not only is the represented party's identity clearly disclosed but it is the only company identified on the checks. There is no basis on the face of the checks for A-1 Check Cashing to have reasonably assumed Piacentini's signature was not that of an authorized representative, whether corporate officer or otherwise, of NTRN. Accordingly, A-1 Check Cashing had no reasonable expectation when it cashed the checks that any entity other than NTRN would be liable for their dishonor.
Under N.J.S.A. 12A:3-402c, a holder in due course could not enforce the dishonored payroll checks against Ameripay. As assignee, Triffin is entitled to no greater rights. There is no basis in law for the trial court's adoption of a balancing of blame or loss allocation analysis as overriding the plain language of the UCC.
Reversed.
NOTES
[1] Each employee cashed two checks.
[2] Triffin did not sue Piacentini, as signatory on the check, in his personal capacity.
[3] Former N.J.S.A. 12A:3-402, Signature in Ambiguous Capacity, provided:

Unless the instrument clearly indicates that a signature is made in some other capacity it is an indorsement.
[L. 1961, c. 120, § 3-402, repealed by L. 1995, c. 28, § 1, eff. June 1, 1995.]
Former N.J.S.A. 12A:3-403, Signature by Authorized Representative, provided:
(1) A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation....
(2) An authorized representative who signs his own name to an instrument
(a) is personally obligated if the instrument neither names the person represented nor shows that the representative signed in a representative capacity;
(b) except as otherwise established between the immediate parties, is personally obligated if the instrument names the person represented but does not show that the representative signed in a representative capacity, or if the instrument does not name the person represented but does show that the representative signed in a representative capacity.
(3) Except as otherwise established in the name of an organization preceded or followed by the name and office of an authorized individual is a signature made in a representative capacity.
[L. 1961, c. 120, § 3-403.]
[4] In Griffin v. Ellinger, 538 S.W.2d 97 (Tex.1976), the president of a corporation who signed checks in payment of corporate obligations was held personally liable because the signature line did not indicate his corporate capacity, even though the checks were drawn on a corporate account and the name of the corporation was printed on the checks.
[5] The version of UCC 3-402(c) addressed in these cases are identical to N.J.S.A. 12A:3-402c.
[6] The case also involved an interpretation of California Civil Code 1719 providing for treble damages in addition to the amount owing on a dishonored check, which is not relevant to the issues in this appeal.