855 A.2d 2 (2004)
372 N.J.Super. 3
Robert J. TRIFFIN, Plaintiff-Appellant,
v.
MELLON PSFS, Defendant-Respondent, and
Current Food Concepts BW, Inc. (d/b/a Burger King # 1082 and Burger King # 15478), Shellen S. White and Nikeya R. Howard, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued April 27, 2004.
Decided June 30, 2004.
*3 Robert J. Triffin, appellant, argued the cause, pro se.
Daniel S. Bernheim, III, Philadelphia, of the Pennsylvania bar, argued the cause for respondent (Silverman, Bernheim & Vogel, attorneys; Alan M. Rosen, on the brief).
Before Judges SKILLMAN, COBURN and C.S. FISHER.
The opinion of the court was delivered by
FISHER, J.A.D.
We are required to consider whether an assignee has standing to bring an action based on a bank's alleged failure to meet the "midnight deadline" regarding two checks paid by his assignor. We disagree with Triffin v. Bridge View Bank, 330 N.J.Super. 473, 750 A.2d 136 (App.Div.2000), and conclude that such an assignee is entitled to prosecute the claim. While the trial judge relied on Bridge View Bank in finding plaintiff Robert J. Triffin lacked standing to suea determination which we rejectthe dismissal of the action will nevertheless be affirmed because no evidence was produced at trial to support the claim that defendant Mellon PSFS violated the "midnight deadline."

I
This action involves two checks purporting to have been made by defendant Current Food Concepts BW, Inc., which does business as two Burger King franchises, one in Philadelphia and the other in Pennsauken. The first was a $335.14 check, dated August 15, 2001, payable to Shellen S. White, and the other was a $365.14 check, dated August 20, 2001, payable to Nikeya R. Howard. There was no dispute that these checks did not come from Current Food's check stock and were not signed by an authorized representative of Current Food.
On August 22, 2001, the checks were cashed by Check Cashing Services, Inc., and deposited in Check Cashing's account with First Union National Bank. First *4 Union then forwarded the checks to Mellon, the payor bank. Mellon apparently paid the checks and charged the account of its customer, Current Food.
The ripple effect caused by these transactions was soon felt by Current Food. On or about August 25, 2001, a Mellon representative notified Current Food that its account was overdrawn. Around September 10, 2001, Current Food received from Mellon Bank its bank statement and cancelled checks, which confirmed that Current Food had been victimized by counterfeits, including the two checks in question.
Current Food executed affidavits of forgery, and Mellon thereafter reimbursed Current Food's account. First Union then reimbursed Mellon and charged the account of its customer, Check Cashing. As a result, the loss caused by these counterfeit checks fell upon Check Cashing, which soon thereafter assigned its claims to Triffin.
Triffin filed a complaint in Special Civil Part against Mellon, Current Food, and the two payees. He later voluntarily dismissed his claim against Current Food and, apparently, never served the payees with process. After a non-jury trial, the judge followed Bridge View Bank and dismissed the claim against Mellon. Triffin argues on appeal that the trial judge erred because his claim was not based on the midnight deadline set forth in N.J.S.A. 12A:4-302, as in Bridge View Bank, but on 12 C.F.R. § 229 (Regulation CC). Because we conclude that Regulation CC is essentially a mirror image of the Uniform Commercial Code sections applicable to this case, we reject Triffin's argument that his sole reliance on Regulation CC, undoubtedly to avoid the precedential effect of Bridge View Bank, is a distinction which makes a difference.
Regulation CC was not intended nor does it have the effect of uprooting the Uniform Commercial Code. Instead, the Board of Governors of the Federal Reserve System, in adopting Regulation CC pursuant to the authority of the Expedited Funds Availability Act, 12 U.S.C.A. § 4001 to § 4010, intended to "supersede any inconsistent provisions of the U.C.C. as adopted in any state, or of any other state law, but only to the extent of the inconsistency." 12 C.F.R. § 229.41 (emphasis added). See also 12 U.S.C.A. § 4007(b); N.J.S.A. 12A:4-103, Uniform Commercial Code comment 3. Since Triffin has not demonstrated how Regulation CC is inconsistent with N.J.S.A. 12A:4-302, as applied here, neither the Supremacy Clause nor Regulation CC itself requires the disregarding of the Uniform Commercial Code. Accordingly, we examine the issues raised with reference to state law and, therefore, must consider whether the holding announced in Bridge View Bank should be followed.

II
In Bridge View Bank, the court considered "whether under the Uniform Commercial Code the assignee of a dishonored check has standing as against the payor bank to enforce the statutory liability created by N.J.S.A. 12A:4-302 when the bank misses the midnight deadline of N.J.S.A. 12A:4-104 and 12A:4-301 for returning or dishonoring the check," and held that "an assignee who purchases the check with notice of the dishonor lacks standing to bring the action." 330 N.J.Super. at 474, 750 A.2d 136. Bridge View Bank followed other authorities in concluding that the rights created by the midnight deadline were "intended solely for the payee, others who may have received the check before dishonor, and collecting banks." Id. at 477, 750 A.2d 136 (citing Lawyers Title Ins. Corp. v. United Am. *5 Bank of Memphis, 21 F.Supp.2d 785 (W.D.Tenn.1998); American Title Ins. Co. v. Burke & Herbert Bank & Trust Co., 813 F.Supp. 423 (E.D.Va.1993), aff'd, 25 F.3d 1038 (4th Cir.1994); 7 Ronald A. Anderson, Uniform Commercial Code, § 4-302:31 (3d ed., 1995 rev.)). We disagree and conclude that a claim based upon a breach of the midnight deadline is assignable, that the assignee may sue in his own name, and that the assignee's knowledge of dishonor or defects in the instrument is irrelevant; it is only what the assignor knew at the time of presentment, and not what the assignee later learned, which is relevant to the claim.
N.J.S.A. 2A:25-1, which has a tradition of being broadly construed, see Kimball Intern. v. Northfield Metal, 334 N.J.Super. 596, 612, 760 A.2d 794 (App.Div.2000), certif. denied 167 N.J. 88, 769 A.2d 1051 (2001), states, in part, that "all choses in action arising on contract shall be assignable, and the assignee may sue thereon in his own name." Since Bridge View Bank was decided, this court has twice rendered decisions, in similar circumstances, which more aptly gave broader application to N.J.S.A. 2A:25-1 than Bridge View Bank. In Triffin v. Somerset Valley Bank, 343 N.J.Super. 73, 82, 777 A.2d 993 (App.Div.2001), another panel rejected the invitation to expand Bridge View Bank to a suit based upon other aspects of the Uniform Commercial Code, stating: "There is nothing in Bridge View Bank to indicate that the holding should be expanded beyond actions brought under N.J.S.A. 12A:4-302." In Triffin v. Quality Urban Housing Partners, 352 N.J.Super. 538, 542, 800 A.2d 905 (App.Div.2002), yet another panel described the assignability of a claim on a dishonored check in the following manner:
[I]f E-Z Check [Triffin's assignor] was a holder in due course at the time it took the check, it had recourse against the maker. It is undisputed that accordingly it also had the right to assign its claim against the maker pursuant to N.J.S.A. 2A:25-1. That is to say, it could not by endorsement after dishonor confer holder in due course status on a transferee but it could assign its claim against the maker. More specifically, defendant conceded at oral argument that a holder in due course has the right to assign any claim he has against the maker following the dishonor of the instrument and irrespective of the assignee's notice of the dishonor.
We entirely agree with Quality Urban's analysis. In these circumstances, Triffin could not attain holder in due course status if he had received, by indorsement, the counterfeit checks in question, because he would have had knowledge of the checks' history. But, as in Quality Urban, Triffin could obtain an assignment of, and pursue, Check Cashing's claim, so long as he could show that Check Cashing "was a holder in due course at the time it paid on the instrument," and that the assignment to him "was valid," 352 N.J.Super. at 542, 800 A.2d 905, neither of which was disputed in the trial court.
We also detect nothing in the Code provisions relating to the midnight deadline which would suggest a restrictive approach to standing. Indeed, the Code does not attempt to describe who the proper claimants might be, thus giving no reason to doubt that it would permit a suit by anyone damaged by a bank's failure to meet its midnight deadline.[1]
*6 The midnight deadline was designed to contribute to the goal of having checks act, as closely as feasible, like cash. It deters banks from simply holding a check and using a drawer's money as long as possible, see James J. White and Robert S. Summers, Uniform Commercial Code, Vol. 2, § 20-2 (4th ed., 1995),[2] by imposing liability for a delay in processing regardless of whether the check was "properly payable or not," see City Check Cashing, Inc. v. Manufacturers Hanover Trust Co., 166 N.J. 49, 58, 764 A.2d 411 (2001); Dienco, Inc. v. Security Nat. Bank of N.J., 221 N.J.Super. 438, 441-442, 534 A.2d 1035 (App.Div.1987); Bank Leumi Trust Co. of N.Y. v. Bank of Mid-Jersey, 499 F.Supp. 1022, 1024-25 (D.N.J.1980), aff'd, 659 F.2d 1065 (3rd Cir.1981). This underlying purpose demonstrates that standing to sue ought to be broadly construed. Banks normally charge back their customers, pursuant to deposit agreements or other provisions of the Code. See N.J.S.A. 12A:4-214. Accordingly, it would appear that persons or entities who have paid on, or were the drawers of, such checks are the likely suitors when a midnight deadline has been breached. The full assignability of such claims, therefore, is in better accord with N.J.S.A. 2A:25-1 and is more likely to secure compliance with the deadline, since it would provide, for example, a single injured party, through the assignment to a person or entity in the business of suing on such checks, a remedy in instances, as here, where it might otherwise not be worthwhile to sue on a small check or checks. See Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau, 701 F.2d 1276, 1283 (9th Cir.), cert. denied, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).
For all these reasons, we are not persuaded by Bridge View Bank and conclude that Triffin had standing to assert Check Cashing's midnight deadline claim.

III
Because the trial judge followed Bridge View Bank and dismissed the action, she did not make findings as to the merits of the claim. Ordinarily, we would remand for such findings, but the record reveals the absence of any merit to Triffin's claim that Mellon violated the midnight deadline and, thus, we view a remand as unnecessary.
The only witnesses were Triffin and Current Food's office manager, neither of whom offered direct evidence about the movement of these checks from the time they were paid by Check Cashing until First Union charged Check Cashing's account. Without any evidence about the intervening events, it cannot be said whether Mellon failed to meet the midnight deadline. Indeed, there is no evidence in the record which would lead to a determination as to when the midnight deadline arose.
On a superficial level, a determination of when a bank's midnight deadline has been *7 surpassed would appear simple,[3] but such deadlines may be impacted by federal regulations, by clearing-house rules or other pertinent agreements. See White & Summers, supra, § 20-4. Ascertaining the deadline also turns on the definition of "banking day," which can be convoluted by numerous circumstances, including the hour of receipt, see N.J.S.A. 12A:4-108(b), and whether the bank was open and "carrying on substantially all of its banking functions" at that hour, see N.J.S.A. 12A:4-104(a)(3); 12 C.F.R. § 229.2(f). Since the evidence does not disclose the day, let alone on what part of the day, the checks were presented to Mellon, or whether Mellon, on that day, was open to the public and carrying on substantially all its functions, Triffin failed to prove when the midnight deadline arosea fact which was critical to his claim that the deadline was surpassed.
Moreover, the evidence does not give rise to any inference that Mellon might have failed to meet the midnight deadline. N.J.S.A. 12A:4-302(a) renders a bank accountable for "a demand item ... whether properly payable or not ... [if it] retains the item beyond midnight of the banking day of receipt without settling for it or ... does not pay or return the item or send notice of dishonor until after its midnight deadline." This midnight deadline is violated when the bank fails to take any of the actions described in the statute and simply retains the check beyond the witching hour. According to the trial testimony, Check Cashing paid the checks on Wednesday, August 22, 2001 and, on or about Saturday, August 25, 2001, Mellon contacted Current Food that its account was overdrawn. While little more evidence was presented regarding these checks, the only reasonable conclusion is that Mellon did respond to these checks within the midnight deadline.
In addition, the midnight deadline rule not only requires a bank, as Triffin argues, to either pay or dishonor a check within the time frame set by N.J.S.A. 12A:4-104(a)(10), but also permits a bank to "settl[e] for it" within that time. The word "settle" in this context is defined as meaning "to pay in cash, by clearing house settlement, in a charge or credit or by remittance, or otherwise as agreed." N.J.S.A. 12A:4-104(a)(11). A settlement may also be "either provisional or final." Ibid. Banks routinely engage in the practice of provisionally paying items, see N.J.S.A. 12A:4-214, Uniform Commercial Code comment 1, subject to the receipt of additional information prior to making final payment, see N.J.S.A. 12A:4-215.[4] There is no reason to conclude, in light of the scant evidence offered at trial regarding what transpired between First Union and Mellon about these checks, that Mellon did not provisionally pay the item subject to a timely revoking of its settlement. And, even if Mellon did finally pay the checks, it may beindeed, it seems quite likely in these circumstancesthat Mellon obtained restitution of the funds it paid on *8 these counterfeit checks pursuant to N.J.S.A. 12A:3-418.[5]
While an understanding of what precisely may have occurred with these checks is not answered by the evidence adduced at trial, there is a notable absence of any evidence which demonstrates, or supports a legitimate inference, that Mellon did not comply with N.J.S.A. 12A:4-302. We, thus, conclude that Triffin failed to sustain his burden of demonstrating a breach of the midnight deadline.
Affirmed.
COBURN, J.A.D., concurring.
Since the majority properly concludes that Triffin failed to prove a violation of the "midnight deadline," its disagreement with the holding in Triffin v. Bridge View Bank, 330 N.J.Super. 473, 750 A.2d 136 (App.Div.2000), is dictum. Consequently, Bridge View Bank, which I wrote and to which I adhere, remains the law of New Jersey.
Neither Triffin v. Somerset Valley Bank, 343 N.J.Super. 73, 777 A.2d 993 (App.Div.2001), nor Triffin v. Quality Urban Housing Partners, 352 N.J.Super. 538, 800 A.2d 905 (App.Div.2002), which were actions against the makers of the checks, contradict the holding in Bridge View Bank. Moreover, N.J.S.A. 2A:25-1, in relevant part, permits assignment of "all choses in action arising on contract...." The action pursued in this case is not based on any contractual right belonging to the check cashier; rather, it is, as the opinion in Bridge View Bank observed, "a cause of action for breach of a statutory duty...." 330 N.J.Super. at 478, 750 A.2d 136. Consequently, it is not assignable under N.J.S.A. 2A:25-1, and nothing in Kimball International, Inc. v. Northfield Metal Products, 334 N.J.Super. 596, 611-15, 760 A.2d 794 (App.Div.2000), certif. denied, 167 N.J. 88, 769 A.2d 1051 (2001), nor in the cases it cites on the broad construction of N.J.S.A. 2A:25-1, contradicts that proposition.
NOTES
[1] Regulation CC states that a payor bank's warranty that it has met the deadline is made to "the transferee returning bank, to any subsequent returning bank, to the depositary bank, and to the owner of the check." 12 C.F.R. § 229.34(a) (emphasis added). Since our decision is based on state law, we need not decide whether an assignee is an "owner of the check" or merely the owner of a cause of actiona decision which might have relevance to whether an assignee would have standing to prosecute a suit based upon Regulation CC.
[2] As Professors White and Summer explained: "If every payee who took a personal check from a customer faced the prospect that he would be at risk to return funds received from a payor against NSF checks until a three or six-year statute of limitations had run, commerce would be stultified. Without the heavy liability that attends even modest delay, a payor bank might adopt a much more leisurely payment procedure. Absent incentive for quickness, the payor's interest is to hold (and use) the drawer's money as long as possible." Ibid.
[3] A bank's "midnight deadline" is defined as "midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." N.J.S.A. 12A:4-104(a)(10).
[4] N.J.S.A. 12A:4-215(a) states, in relevant part, that "[a]n item is finally paid by a payor bank when the bank has first done any of the following: (1) paid the item in cash; (2) settled for the item without having a right to revoke the settlement under statute, clearing-house rule, or agreement; or (3) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing-house rule, or agreement."
[5] N.J.S.A. 12A:3-418(a), in pertinent part, states that, except against, for example, a person who took the instrument in good faith and for value, "if the drawee [here, payor bank Mellon] of a draft pays or accepts the draft and the drawee acted on the mistaken belief that ... the signature of the drawer of the draft was authorized, the drawee may recover the amount of the draft from the person to whom or for whose benefit payment was made [here, First Union] or, in the case of acceptance, may revoke the acceptance."