926 A.2d 362

ROBERT J. TRIFFIN, PLAINTIFF–RESPONDENT/CROSS–AP-
PELLANT, v. AUTOMATIC DATA PROCESSING, INC., DE-
FENDANT/THIRD–PARTY PLAINTIFF–APPELLANT/CROSS–
RESPONDENT, v. LINDA AVALLONE, THIRD–PARTY DE-
FENDANT.

Superior Court of New Jersey
Appellate Division

Argued May 9, 2007—Decided June 28, 2007.

238

Before Judges STERN, SABATINO and LYONS.

*Dennis T. Kearney* argued the cause for appellant/cross-respondent (*Pitney Hardin, attorneys; Mr. Kearney and Carole Lynn Nowicki,* on the brief).

*Robert J. Triffin,* respondent/cross-appellant, argued the cause pro se.

The opinion of the court was delivered by

LYONS, J.S.C., temporarily assigned.

Defendant, Automatic Data Processing, Inc. ("ADP"), appeals an order for remittitur, reducing a jury verdict of $132,600 in compensatory damages and $50,000 in punitive damages entered on defendant's counterclaim, which asserted plaintiff, Robert J. Triffin ("Triffin"), committed common law fraud against defendant. Plaintiff cross-appeals claiming that defendant lacks standing to assert its common law fraud claim against plaintiff; and that the trial court erred when it allowed defendant's claim for investigatory expenses to be recovered, when it applied the Supreme Court's requirements for punitive damage awards, when it entered judgment for defendant against the weight of the evidence and when it denied plaintiff's post-trial motions and motions to dismiss at the end of defendant's case.

The following factual and procedural history is relevant to our consideration of the issues advanced on appeal. Plaintiff is in the business of purchasing dishonored checks and taking assignments from the sellers by which he seeks to recover as holder in due course from banks and others in the collection process. *See generally, Triffin v. TD Banknorth, N.A.,* 190 *N.J.* 326, 920 *A.*2d 649 (2007); *Triffin v. Bank of Am.,* 391 *N.J.Super.* 83, 917 *A.*2d 257 (App.Div.2007); *Triffin v. Am. Int'l Group, Inc.,* 372 *N.J.Super.* 517, 859 *A.*2d 751 (App.Div.2004); *Triffin v. Mellon PSFS,* 372 *N.J.Super.* 221, 858 *A.*2d 1 (App.Div.2004), *overruled in part by TD Banknorth, supra; Triffin v. Mellon PSFS,* 372 *N.J.Super.* 3, 855 *A.*2d 2 (App.Div.2004), *overruled in part by TD Banknorth, supra; Triffin v. Trav. Express Co.,* 370 *N.J.Super.* 399, 851 *A.*2d 667 (App.Div.2004); *Triffin v. Pomerantz Staffing Servs., LLC,*

370 *N.J.Super.* 301, 851 *A.*2d 100 (App.Div.2004); *Triffin v. Ameripay, LLC,* 368 *N.J.Super.* 587, 847 *A.*2d 628 (App.Div.2004); *Triffin v. Johnston,* 359 *N.J.Super.* 543, 821 *A.*2d 92 (App.Div. 2003); *Triffin v. Quality Urban Hous. Partners,* 352 *N.J.Super.* 538, 800 *A.*2d 905 (App.Div.2002); *Triffin v. Somerset Valley Bank,* 343 *N.J.Super.* 73, 777 *A.*2d 993 (App.Div.2001); *Triffin v. Bridge View Bank,* 330 *N.J.Super.* 473, 750 *A.*2d 136 (App.Div. 2000); *Triffin v. First Union Bank, N.A.,* 319 *N.J.Super.* 72, 724 *A.*2d 872 (App.Div.1999); *Triffin v. Cigna Ins. Co.,* 297 *N.J.Super.* 199, 687 *A.*2d 1045 (App.Div.1997). As of November 2004, plaintiff had filed over 4,000 such lawsuits. *Am. Int'l Group, supra,* 372 *N.J.Super.* at 521, 859 *A.*2d 751. It is the purchase of such checks that has given rise to this action.

This case began as three separate lawsuits that plaintiff filed in the Special Civil Part against defendant and others. Defendant was the common defendant on all the claims and the first named defendant on the lawsuits. In the complaints, plaintiff asserted claims based on twenty-three dishonored or counterfeit checks totaling $11,021.33. Plaintiff annexed to each complaint copies of an assignment agreement ("agreement") corresponding to each dishonored check at issue. The assignment agreement attached to each check is a two-page printed agreement containing thirty numbered paragraphs. Each agreement identifies plaintiff as the buyer and a specifically named check cashing facility as the seller. The agreement contains a certification from the seller's representative that he or she is authorized to execute the agreement and that the facts contained in it are true and correct to the best of the individual's knowledge, information and belief. It also identifies the named representative of the seller. After transferring to buyer seller's interest in the item at issue, the seller makes numerous warranties which would evidence that the seller was a holder in due course under Article 3 of the *Uniform Commercial Code. See N.J.S.A.* 12A:3–302. In addition to the warranties and representations, the agreement evidences the seller's assent to hold the buyer harmless and cooperate with buyer in prosecuting his claims on the items.

Plaintiff purportedly purchased the checks at issue in this case from licensed check cashing businesses. Plaintiff's complaint claimed that thirteen of the checks were purchased from McCall's Liquor Corp. ("McCall's") and five were purchased from Community Check Cashing II, LLC ("CCC"). All of the McCall's checks and four of the five CCC checks were dishonored by the depositing banks as counterfeit. The fifth check held by CCC was never cashed.

Before filing the instant lawsuit against defendant, plaintiff sought and obtained a meeting with defendant's in-house counsel and other representatives to demand payment on the items. During that meeting, plaintiff presented defendant with the original checks. According to defendant's in-house counsel, at the meeting plaintiff stated he knew the items were counterfeit. Defendant informed plaintiff at the meeting it would not pay the face value of the checks. Plaintiff sent a follow-up letter demanding payment, however, defendant refused and the lawsuits followed.

At trial, defendant's in-house counsel, Joan Ibson ("Ibson"), explained the reason for defendant's refusal to pay and decision to contest the litigation:

[Defendant's Counsel:]

Q. Okay. And as a result of receiving the lawsuit, did you reach any decisions on how to handle it?

[Ibson:]

A. When we received the lawsuit, we decided that we were going to have to fight this because we felt that, even though it was a low dollar amount—let—let me just go back and explain that when we get either a claim or a lawsuit, we have to decide, you know, how much are they demanding, how much is it going to cost us in legal fees; you know, what's going to be more cost effective; to just pay or just try and settle the—the case for a lower dollar amount, pay them what they're demanding or litigate it. And in this particular case, we felt that, you know, we had to fight it because basically what he was telling us is, "A.D.P., we want you to be responsible for any counterfeit check that comes through." So that means anyone can go out and get an A.D.P. check,—you know, any—their—we pay many people. They just have to scan it in, change the date, the person's name on it, scan it through and then present it back to A.D.P. and say, "I want to be paid for this."

[Defendant's Counsel:]

Q. So that as a result of this, what decision did you make as in-house—in-house counsel as how to handle the case.

[Ibson:]

A. We had to fight it.

Ibson testified that when she first reviewed the assignment agreements which were attached to the complaint, she assumed they were valid and would not have met with plaintiff if she did not believe he had the right to pursue a claim on the checks.

During discovery, it was found that the assignment agreements attached to each of McCall's and CCC's checks were not manually signed by representatives of the sellers of those checks. In fact, the testimony demonstrated that each of the agreements attached to the checks in the complaint were completed after the transactions were concluded with the sellers and the checks had been delivered to plaintiff. Further, testimony indicated that the McCall's checks were actually purchased from Speedwell Liquors and that the assignments, which were purportedly executed by "Juan Rafael Tavera, Vice President McCall's Liquor Corp." ("Tavera") were not manually signed by Tavera and that he was never an officer of McCall's.

At trial, plaintiff produced three signatures from the sellers, two from a representative of CCC, and one from Speedwell Liquors. The signatures were on a blank second page of the two-page printed assignment form attached to the complaint. Each form had a single line written diagonally through some of the text on the page. Tavera testified that he never signed the assignment forms nor did he see them. The representative from CCC testified that she signed something but made no promises to plaintiff, and that what she signed did not look like the assignment agreements.

The McCall's and CCC representatives never signed the individual assignments attached to the complaint. Plaintiff acknowledged he had scanned the individuals' signatures into his computer and then using his computer "pasted" them on to assignment forms he had on his computer. In fact, plaintiff manufactured assignment agreements for each of the McCall's and CCC checks,

which agreements were never signed by representatives of the sellers nor did they agree to the specific terms contained in the assignments. Upon learning this, defendant filed a counterclaim alleging common law fraud, RICO, and negligence. The lawsuits were transferred to the Law Division and consolidated.

Defendant filed a motion for summary judgment on plaintiff's complaint and plaintiff filed a cross-motion for judgment on defendant's counterclaim. The trial court granted defendant's motion for summary judgment, dismissed all counts of plaintiff's complaint, and denied plaintiff's cross-motion. Following an eight-day trial, a jury held plaintiff liable for common law fraud. The jury awarded defendant $132,600 in compensatory damages and $50,000 in punitive damages. The jury returned a no-cause verdict on the RICO claim and did not consider the merits of the negligence claim because the favorable jury verdict on defendant's fraud claim rendered the negligence claim moot.

Following the verdict, plaintiff filed a post-trial motion seeking judgment notwithstanding the verdict, a new trial, reconsideration of the denial of plaintiff's motion for involuntary dismissal under R. 4:40–1, remittitur and other relief. After oral argument, the court denied all of plaintiff's motions except his request for remittitur. The court reduced the jury verdict from $132,600 to $5,919.80, representing the fees defendant paid to a private investigator to help uncover plaintiff's fraud. The court also reduced the punitive damage award from $50,000 to $17,759.40, representing triple the amount of compensatory damages.[1]

The trial court noted that the only evidence of damages before the jury, in addition to the investigator's fees, were counsel fees incurred by defendant in uncovering and prosecuting the fraud claim. The court held that counsel fees are not cognizable damages in a tort action such as this and, hence, reduced the verdict

---

[1] The parties agree that the trial court mistakenly reduced the punitive award. *See N.J.S.A.* 2A:15–5.14, which limits damages to five times compensatory damages or $350,000, whichever is the greater.

accordingly. Following the entry of those orders, this appeal ensued.

Defendant argues before us that the trial court erred in reducing the jury's damage award arising from plaintiff's common law fraud. Plaintiff argues that the trial court correctly excluded counsel fees as an element of damages; that defendant lacks standing to assert a common law fraud claim against plaintiff; and that the trial court committed error when it entered judgment for the investigatory expenses, when it "misapplied" the Supreme Court's requirement for punitive damage awards, when it entered judgment against plaintiff because it was against the weight of the evidence, and when it denied plaintiff's post-trial motions.

■ We begin our analysis of this matter by reviewing the legal principles involved in a claim for common law fraud. The five elements of common law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 148 *N.J.* 582, 610, 691 *A.*2d 350 (1997). Defendant argues that its claim of common law fraud is supported by the record. Plaintiff, on the other hand, argues there was no fraud because he purchased the checks from the sellers and was authorized by the sellers to affix facsimiles of their signatures on assignment agreements when they signed the blank second pages of the assignments.

■ We do not dispute that plaintiff purchased the checks. However, we see nothing in the record which demonstrates that he was legally authorized to affix facsimile signatures of the sellers to the assignments, or that the sellers agreed to the numerous substantive warranties, representations and contractual promises contained in the assignment forms. It is clear to us that the assignment agreements attached and referred to in the complaint misrepresented the terms and conditions of the sale of the checks.

It is also clear that these manufactured and unauthorized assignment agreements were material. *N.J.S.A.* 12A:3–302a defines a holder in due course. Under *N.J.S.A.* 12A:3–305, a holder in due course is not subject to certain defenses and claims in recoupment. In order for plaintiff to pursue his claims on the items and possess the status of a holder in due course, under *N.J.S.A.* 2A:25–1, a valid assignment of the instruments is required. Plaintiff could not, by endorsement and after dishonor, be a holder in due course. *See Quality Urban Hous. Partners, supra,* 352 *N.J.Super.* at 538, 800 *A.*2d 905. If plaintiff were able to pursue his claims on the items as a holder in due course, by way of a valid assignment, numerous defenses which could be raised by a defendant against him would not be effective. *See N.J.S.A.* 12A:3–305b. "With some exceptions, the holder in due course is immune to defenses, claims in recoupment, and claims of title that prior parties to commercial paper might assert. The holder in due course also enjoys certain pleading and proof advantages." James J. White & Robert S. Summers, *Uniform Commercial Code* § 14–1 at 507 (5th ed.2000). Hence, the efficacy of the assignment and the recognition that plaintiff possessed the status of holder in due course by virtue of the warranties and representations in the assignment were material.

The trial record clearly supports that there was a material misrepresentation of a presently existing or past fact. It also indicates that plaintiff knew that sellers did not agree to some of the representations and warranties contained in the assignment agreements, and that the signatures on the assignments were not affixed by sellers' representatives or with their knowledge and informed consent. In addition, it is clear to us that plaintiff intended defendant to rely upon the assignment agreements. They were specifically attached to the complaint and, in the opening paragraph of the complaint, each assignment made reference to evidence that plaintiff holds all of the rights in the dishonored checks and that they confer holder in due course status on plaintiff.

 The issue of paramount concern to us, however, is the fourth element of common law fraud, that is, reasonable reliance by the other person on the material misrepresentation. An exhaustive review of the record does not demonstrate that defendant either took, or refrained from taking, steps to protect its interests based upon the misrepresentation that the assignment agreements were authentic. In response to whether defendant in any way relied on the assignment agreement, Ibson, defendant's in-house counsel, said, "I would not have even met with him if I didn't believe that he had the right to pursue a claim on these checks." Yet, there was no evidence she ever saw the assignments before they were attached to the complaint. When asked earlier about defendant's position with respect to paying the checks, however, Ibson clearly said that defendant's concern was paying counterfeit checks. Ibson testified that defendant decided after the meeting with plaintiff that it would not pay plaintiff on the counterfeit checks because "even though it was a low dollar amount . . . we had to fight it because basically what [plaintiff] was telling us is ADP we want you to be responsible for any counterfeit check that comes through . . . [w]e had to fight it."

Ibson's testimony indicates that even though defendant may have relied upon the assignment to give plaintiff standing and to have a meeting with him, from the outset and even before the litigation was filed, defendant decided that the underlying checks were counterfeit and would not settle, regardless of whether plaintiff was a mere holder or a holder in due course. Consequently, defendant's position to "fight" the payment for these items was made without relying on the manufactured assignment agreements.

Moreover, the record does not reveal if the assignments were presented at the meeting or were first seen by defendant when attached to the complaint. All that is in the record on that point is the following:

[Defendant's Counsel:]

Q. What, if any, impressions did you have on behalf of A.D.P. when you got the Complaint with these Assignment Agreements?

[Ibson:]

A. When I looked at the Assignment Agreement, my impression was that Triffin had a right to be asking for payment on these checks because—

 Without reasonable reliance on a material misrepresentation, an action in fraud must fail. Reliance is an essential element of common law fraud. *Byrne v. Weichert Realtors,* 290 *N.J.Super.* 126, 137, 675 A.2d 235 (App.Div.), *certif. denied,* 147 *N.J.* 259, 686 A.2d 761 (1996). The *Restatement (Second) of Torts* § 537 (1977) requires that there be justifiable reliance if one is to recover on a fraudulent misrepresentation. Section 537(a) requires a recipient of a fraudulent misrepresentation to rely on the misrepresentation "in acting or refraining from action." *Ibid.* In the instant case, defendant clearly stated at the outset, that it was going to contest the claim because the checks were counterfeit. It neither acted nor refrained from action based upon the fraudulent assignment agreements. Defendant did not act in reliance upon the fraudulent assignment, such as by paying the check, nor did it refrain from acting for that reason. It did not pay because the checks were counterfeit. "One cannot secure redress for fraud when [one] acted in reliance upon his own knowledge or judgment based upon an independent investigation." *Golden v. Nw. Mut. Life Ins. Co.,* 229 *N.J.Super.* 405, 415, 551 A.2d 1009 (App.Div.1988). Consequently, defendant's judgment for fraud cannot stand because one of the required essential elements is absent.[2]

Because the record does not support a finding that all of the elements of common law fraud are present, we are constrained to reverse the judgment for compensatory damages and for punitive damages. However, our action herein should not be construed as exonerating plaintiff from manufacturing assignment agreements and attaching them to pleadings so as to obtain standing to pursue claims on dishonored items, as well as to be accorded the status of holder in due course. To the contrary, we strongly condemn and denounce this course chosen by plaintiff irrespective of whether

---

[2] We need not address the issue of damages in light of the fact that the predicate requirement of reliance is not supported in the record before us.

the attachment of the assignment to the complaint was necessary to support the action.

■ Having determined that the common law fraud judgment cannot stand, we find ourselves in a situation in which there is a clear wrong, yet no readily apparent remedy. On its face, *R.* 1:4–8 would appear to address the issue. We note that *R.* 1:4–8(a) provides that the signature of a pro se party constitutes a certification that the signatory has read the pleading and by signing same certifies to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that the paper being submitted is not presented for an improper purpose and that any factual allegations in such papers have evidentiary support. Under *R.* 1:4–8, a pro se party is obligated to be candid and forthright with the court when filing papers. To represent to a court and an adversary that a manufactured document attached to a pleading is an authentic representation of what a person actually signed and agreed to when that is not the case is reprehensible.[3] While plaintiff may have been liable for sanctions under *R.* 1:4–8, the time for either the court or defendant to seek such sanctions has expired. *See R.* 1:4–8(b) and (c).

We also note that while plaintiff is not liable for the judgment sounding in common law fraud, the matter has been referred by the trial courts to the county prosecutor and Attorney General for review. Our reversal on the common law fraud count is not intended to and should have no bearing on any investigation conducted by those offices. Any action taken in that arena, however, would not afford any relief to defendant.

---

[3] Plaintiff argues that *R.* 1:4–8(f) excepts a pro se party from the rule. We disagree. *R.* 1:4–8(f) requires that a litigant moving for sanctions against a party other than a pro se party comply with the safe harbor provision, but only to the extent practicable. *See Toll Bros., Inc. v. Twp. of W. Windsor,* 190 *N.J.* 61, 69, 72, 918 *A.*2d 595 (2007).

We also recognize that given the record in this case, all parties defending future claims by plaintiff on purchased dishonored checks, are on notice to scrupulously explore the legitimacy of any tendered assignments. That, of course, only addresses potential further harm.

Defendant chose to pursue a counterclaim sounding in common law fraud, RICO and negligence instead of an action for abuse of process. *See Penwag Prop. Co. v. Landau,* 148 *N.J.Super.* 493, 499, 372 *A.*2d 1162 (App.Div.1977), *aff'd,* 76 *N.J.* 595, 388 *A.*2d 1265 (1978). Given the current posture of the case, it would be improper to amend defendant's pleadings at this time. *See* Pressler, *Current N.J. Court Rules,* comments 1 through 2.4 on *R.* 4:9 (2007).

Our courts have long held, however, that where there is a civil wrong, there should be a remedy. *See Crane v. Bielski,* 15 *N.J.* 342, 349, 104 *A.*2d 651 (1954). In *Baxt v. Liloia,* 155 *N.J.* 190, 210, 714 *A.*2d 271 (1998), the Court pointed out that in a unique factual and legal situation, where the dismissal of an action left a meritorious litigant without a remedy and where the offending party was on notice of the damages sought, the Court would permit the litigant to go forward with an application for relief. In this case, there has been a wrong in our view, a possible fraud on the court.

A fraud on the court occurs "where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.,* 892 *F.*2d 1115, 1118 (1st Cir.1989); *Perna v. Elec. Data Sys. Corp.,* 916 *F.Supp.* 388, 397 (D.N.J.1995). Unlike common law fraud on a party, fraud on a court does not require reliance. Separate and distinct from court rules and statutes, courts possess an inherent power to sanction an individual for committing a fraud on the court. *See, e.g., Chambers v. NASCO, Inc.,* 501 *U.S.* 32, 111 *S.Ct.* 2123, 115 *L.Ed.*2d 27 (1991); *Perna, supra,* 916 *F.Supp.*

at 388; *Penwag Prop., supra,* 148 *N.J.Super.* at 505, 372 *A.*2d 1162 (Kole, J.A.D., concurring).

In *Atkinson v. Pittsgrove Twp.,* 193 *N.J.Super.* 23, 30–31, 471 *A.*2d 1215 (Ch.Div.1983), the court assessed sanctions against a person who previously abused the legal process. The court noted that it possessed the inherent power to impose sanctions and that such authority stemmed from its status as a constitutional court whose basic jurisdiction and prerogatives are traced from the Court of Kings Bench and the Court of Chancery. Judge Miller noted, "this court has the power and duty to protect the purity and efficiency of its own processes against the type of conduct pursued by plaintiff herein. The court has the inherent power to protect itself and litigants against harassment and vexatious litigation and an abuse of process." *Id.* at 32, 471 *A.*2d 1215.

We distinguished the *Atkinson* case in *Berthelsen v. Hall,* 194 *N.J.Super.* 22, 475 *A.*2d 1275 (App.Div.1984). In *Berthelsen,* we held that prior to the adoption of *R.* 1:4–8, the court had to rely on contempt proceedings to sanction a litigant or attorney for frivolous litigation. We also specifically noted, however, that *Atkinson* was not a case where attorney fees were sought for frivolous litigation as in *Berthelsen,* but involved a case where sanctions were sought because the plaintiff had instituted multiple suits based upon a cause of action which had been fully adjudicated. The instant case, like *Atkinson,* is one that involves an abuse of process as opposed to a frivolous claim or an instance of discovery abuse.

 The United States Supreme Court has made it clear that the court may exercise inherent power to sanction a party when he or she has, "acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Chambers, supra,* 501 *U.S.* at 45, 111 *S.Ct.* at 2133, 115 *L.Ed.*2d at 45. In *Chambers,* the plaintiff was seeking specific performance of a contract and the defendant engaged in various forms of delay and obfuscation tactics to frustrate the court and the litigants. The Court noted that the federal rules and statutes did not directly address sanctioning the

action of the party. The Court made it clear, however, that while it must exercise caution in invoking its inherent power and must comply with the mandates of due process, in circumstances where the litigant's entire course of conduct evidences bad faith and an attempt to perpetrate a fraud on the court, such conduct is sanctionable. *Id.* at 45, 111 *S.Ct.* at 2136, 115 *L.Ed.*2d at 49. In *Aoude, supra,* 892 *F.*2d at 1118, the court stated that, "[t]here is an irrefragable linkage between the courts' inherent powers and the rarely-encountered problem of fraud on the court. Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system." *See also Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 *U.S.* 238, 246, 64 *S.Ct.* 997, 1001, 88 *L.Ed.* 1250, 1256 (1944). Where appropriate then, a court may use its inherent powers to sanction the perpetration or attempted perpetration of a fraud upon the court. *See, e.g., Perna, supra,* 916 *F.Supp.* at 388.

 Therefore, recognizing that the trial court possesses inherent power to sanction a fraud on the court, we remand this matter to the trial court for further proceedings. Following a hearing, the trial court may impose sanctions on plaintiff on its own motion or on the application of defendant, or both. In determining whether sanctions are appropriate, the trial court shall exercise reasonable discretion, recognizing the caution which must be exercised in invoking its powers and complying with the mandates of due process.

Accordingly, we reverse the entry of judgment for defendant on the counterclaim and remand the matter to the trial court.