102 N.J. Super. 123 (1968)
245 A.2d 507
BILL J. GAMBOCZ, PLAINTIFF-APPELLANT,
v.
LILLIAN APEL (AND SIX OTHERS), DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 22, 1968.
Decided July 12, 1968.
Before Judges CONFORD, COLLESTER and LABRECQUE.
Mr. Lee A. Holley argued the cause for appellant (Messrs. Holley and Kroner, attorneys).
*124 Mr. Mark D. Larner argued the cause for respondents (Messrs. Budd, Larner, Kent & Gross, attorneys).
The opinion of the court was delivered by CONFORD, S.J.A.D.
Plaintiff brought this action against various police personnel and the municipal court clerk of the Township of Edison for malicious abuse of process and for conspiracy to abuse the processes of the municipal court. The Township was also joined as defendant on the theory of respondeat superior. The Law Division dismissed the action at the conclusion of plaintiff's proofs. Hence this appeal.
Plaintiff's case was partly based upon depositions taken from defendant LaPlaga, an Edison police patrolman, and defendant Ellmyer, Chief of Police. The plaintiff's material proofs may be substantially summarized as follows, giving plaintiff the benefit of all reasonable inferences.
In August 1965 plaintiff was a candidate for Mayor of Edison, running against the incumbent Mayor Yalencsics. In the middle of that month plaintiff made a complaint to the Middlesex County Prosecutor of allegedly improper use of township workers and facilities by Yalencsics in the manufacture of campaign material, and thereafter he gave deposition testimony in the prosecutor's office presumably supporting that complaint.
The gravamen of plaintiff's case is that LaPlaga and Ellmyer unduly, wrongfully and excessively participated in and promoted the prosecution of a bad check charge against plaintiff in the municipal court by one Marie Keller, not here a defendant, for the ulterior purpose of harassing and oppressing plaintiff in retaliation for his political activities against the incumbent mayor, their superior. The other individual defendants are charged with participating in this improper activity. The testimony of LaPlaga and Ellmyer varied somewhat as to the details of the transactions underlying this controversy.
LaPlaga's testimony on depositions was as follows. On August 30, 1965 he had been detailed to Marie Keller's home *125 to investigate a hit-run accident in which she was a victim. When he had finished this business and was about to leave, Mrs. Keller asked him what she could do about a check given her which had been returned for insufficient funds. He replied she could bring it to an attorney or file a criminal complaint against the maker "if she wanted to have any restitution on the thing." This was what he had been "taught." Mrs. Keller then handed the check to LaPlaga for appropriate disposition, saying she was willing to file the criminal complaint. Upon receiving the check, LaPlaga was told by Mrs. Keller for the first time that it was made by plaintiff, who he knew was running for mayor.
The next day, August 31, LaPlaga turned the check over to Chief Ellmyer at headquarters with an explanation of how he got it. The chief told him to tell Mrs. Keller that if she wished to file a criminal complaint she would have to come in to do so. LaPlaga so advised her, and Mrs. Keller asked to be driven to headquarters because her car was damaged. LaPlaga phoned Ellmyer and received permission to do this, and he then brought her in. On the way, Mrs. Keller asked how to apply for a position as a school crossing guide, and LaPlaga furnished the information. At headquarters, Ellmyer directed LaPlaga to turn Mrs. Keller over to the detective bureau for processing the complaint.
Ellmyer's version of the matter to that point was this. LaPlaga saw him on August 30, not 31, and told him about the hit-run accident and the check, including plaintiff's identity as the maker. Ellmyer knew plaintiff was running for mayor. He told LaPlaga he wanted to see the check so that he could determine if it was a "bad check." The next day, August 31, LaPlaga brought Mrs. Keller to his office, Ellmyer having meanwhile acceded to a request by Mrs. Keller, relayed through the desk lieutenant, for transportation to headquarters. Ellmyer called in Captain Pinter of the detective bureau and turned Mrs. Keller and her check over to Pinter, saying, "I think she got [sic] a complaint." Pinter took her to the detective bureau.
*126 While at the detective bureau Mrs. Keller gave and signed a statement concerning the matter of the check. Defendant Lt. Miller of the police department thereafter brought Mrs. Keller to the violations bureau of the municipal court. Defendant Apel, court clerk, testified she questioned Mrs. Keller and was told the latter wanted to sign a complaint for a "worthless check" but that she couldn't wait for it to be typed up. Apel, relying on the availability of the statement given by Mrs. Keller, had her sign a blank form of complaint, so that she could leave, and later filled in the details from the statement and signed it as clerk.
LaPlaga testified he was "called in" to take Mrs. Keller home, and on the way, at her request, stopped in at the records bureau to get her a school-guard job application. He also testified that when he and she were in Ellmyer's office she had inquired about an attorney for her accident case, and the latter had recommended Joe Ferenczi, who happened to be Mayor Yalencsics' campaign manager. Ellmyer had instructed LaPlaga to take her to Ferenczi's office if she wished to go there. He did so, and Ferenczi and Mrs. Keller discussed the accident. Mrs. Keller also asked Ferenczi whether she should accept any money from plaintiff if he offered it, and Ferenczi told her not to if she had signed a criminal complaint. Ferenczi had no further connection with either the accident or the check matter.
Defendant Lt. McGinnis of the police department went to plaintiff's parents' home in Perth Amboy the same day to arrest plaintiff on a warrant issued pursuant to the complaint. He was there about ten minutes. The details of the visit were adduced mainly through testimony of plaintiff's mother, whose English was imperfect. McGinnis apparently told her he was seeking plaintiff there (rather than at his Edison office and home) for the reason that "he's [plaintiff] supposed to be home" (in Perth Amboy) because his father was sick. The mother told McGinnis the father had been sick seven years and that plaintiff wasn't there. She asked McGinnis, who identified himself as a police officer, "what is *127 the trouble," and he responded, "Bill is in big trouble, and the Chief Policeman wanted to talk with him." Plaintiff's father, "very sick," was in an adjoining bedroom at the time. Another witness testified that Mrs. Gambocz was "crying" during McGinnis' visit. Later that day McGinnis arrested plaintiff at his home in Edison.
Some time the same day the local press heard of the incident. A Perth Amboy reporter went to Edison police headquarters, requested information and was given a copy of Mrs. Keller's statement and of the police report. A New Brunswick reporter, making a routine stop at headquarters, was given the story but not the statement. There was resultant damaging publicity over the charge.
That evening plaintiff got Mrs. Keller to make a statement that she would not press the charge. When plaintiff proffered this to Ellmyer the next day the latter said: "It's out of my hands. It is in the hands of the court."
Robert Engel, a cousin of Ellmyer and a county detective attached to the prosecutor's office, testified that in September 1965 he had occasion to meet Ellmyer. The latter said he was not pleased by the prosecutor's investigation of plaintiff's complaint against Yalencsics' activities (see supra). He asked Engel to request the prosecutor's investigator "not to make such a big deal out of this thing." He then said: "We have this Gambocz where we want him * * *. We got a check on him that's no good * * *. We'll show him that we can stick him in front of a Grand Jury, too * * *. We're going to give him a flim-flam like we gave Moyer [apparently a previous political challenger of the township administration]." In the spring of 1966 Ellmyer told Engel that because the Grand Jury had decided not to indict plaintiff, "they put us in trouble * * *. They put us behind the 8-ball."
The other testimony in the case concerned damages, a subject not discussed in the briefs.
*128 A succinct summary of the law of malicious abuse of process is set forth in Prosser, Law of Torts, § 115, pp. 876-77 (3d ed. 1964):
"The gist of the tort is * * * misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance. * * * The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coercion to obtain a collateral advantage, * * * such as the surrender of property, * * * by the use of the process as a threat or club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort."
Accord: Restatement of Torts, § 682, p. 464 ("The gravamen of the misconduct * * * is the misuse of process, * * * the subsequent misuse of process."); 1 Am. Jur.2d, Abuse of Process, §§ 4, 14, pp. 252-53, 261-62 (1962) (and cases cited therein); see also Restatement of Torts, Second, § 136 d., p. 244.
Exemplary cases in New Jersey are Ash v. Cohn, 119 N.J.L. 54 (E. & A. 1937), and Earl v. Winne, 34 N.J. Super. 605 (Cty. Ct. 1955). In the Cohn case defendant, who had won a $500 judgment in a malicious prosecution suit against plaintiff, secured a writ of execution and corruptly directed the court's sergeant-at-arms to return the writ nulla bona even though plaintiff was known to have land and chattels to which the writ might attach in satisfaction of the judgment. Defendant presented to the court the unsatisfied return and a false affidavit reciting that plaintiff was not a freeholder, and, as was hoped by defendant, the court responded by issuing a capias which defendant executed *129 against plaintiff on a Saturday night when it was known the issuing judge would be unavailable to release plaintiff. "[T]he planned objective was, by means of the execution against the body of the [plaintiff], swiftly to enforce the satisfaction of the execution * * * without recourse to the regular procedure of * * * making a levy upon and sale of [plaintiff's] goods and chattels * * *." (at p. 56) Defendant's scheme was successful; "satisfaction of the execution was thus coercively effected." There followed plaintiff's action for abuse of process. The Court of Errors and Appeals, after first outlining the elements of the tort ("The action * * * lies for the improper, unwarranted and perverted use of process after it has been issued * * * [accompanied by] an ulterior motive. * * * [I]f the act be a proper one, the motive is immaterial." Id., at p. 58 (emphasis added)), held there had been an actionable, tortious abuse of process at two levels: first, defendant's calculated perversion of the original and properly issued writ of execution by its later perjured return (subsequent abusive act); second, defendant's also calculated perversion of the capias "by arresting and imprisoning plaintiff at a planned time when they well knew that he could not very well obtain his release and could, therefore, be harrassed [sic] and coerced into satisfying the debt." (at p. 59.)
In Earl v. Winne, supra, plaintiff had been indicted for criminal libel for certain campaign statements he had made against defendant, then Bergen County Prosecutor. Later plaintiff retracted his statement, allegedly as a result of pressure exerted by defendant by the method of keeping the indictment pending until the retraction was forthcoming. After the retraction the indictment was nolle prossed. The court dismissed the complaint brought, inter alia, for abuse of process, at the end of plaintiff's proofs, for insufficiency. Although conceding that there was evidence from which a jury could find that defendant had procured the indictment with the ulterior motive of forcing a retraction, the court held that plaintiff had offered no evidence from which a jury *130 could find that defendant, in promotion of the ulterior motive, had used the process as a club or threat by delivering an ultimatum that defendant would nolle pros. the indictment only if plaintiff would retract the libel. Rather, it was held, plaintiff's retraction was performed voluntarily, gratuitously. As there was no active perverted use of the criminal process after its issuance, there was no cause of action for malicious abuse of process, notwithstanding that the valid process was caused to be issued for an improper purpose, and that the improper purpose was realized. The court said (34 N.J. Super., at pp. 614-16):
"The gist of the action * * * is the unlawful use of lawful process after its issuance. * * * An ulterior motive alone is not sufficient. To constitute improper direction of process, the mere ulterior motive in doing an act, proper in itself, does not suffice. There must be such use of it as in itself is without the scope of the process and hence improper. * * *

* * * * * * * *
While malicious abuse of criminal process cases more frequently take the form of working upon the fears of a person under arrest for the purpose of extorting money or property from him or compelling him to sign some paper or give up some claim or perform some act in accordance with the wishes of the prosecution, it must always be shown that an unlawful act in the use of the process compelled the wrongful extortion or restraint of the person to give rise to liability."
The foregoing expressions concerning the requirement of further acts by defendant after the issuance of the process appear to be in accord with the standard authorities on the subject and with the great weight of authority. See, illustratively, in addition to the citations, supra, Hauser v. Bartow, 273 N.Y. 370, 7 N.E.2d 268, 269-270 (Ct. Ap. 1937); Doctor v. Riedel, 96 Wis. 158, 71 N.W. 119 (Sup. Ct. 1897); Wood v. Bailey, 144 Mass. 365, 11 N.E. 567, 575 (Sup. Jud. Ct. 1887); Spellens v. Spellens, 49 Cal.2d 210, 317 P.2d 613, 625-627 (Sup. Ct. 1957); McGann v. Allen, 105 Conn. 177, 134 A. 810, 814-15 (Sup. Ct. Er. 1926); Melton v. Rickman, 225 N.C. 700, 36 S.E.2d 276, 162 A.L.R. 793 *131 (Sup. Ct. 1945); Tranchina v. Arcinas, 78 Cal. App.2d 522, 178 P.2d 65 (D. Ct. App. 1947); Brown v. Robertson, 120 Ind. App. 434, 92 N.E.2d 856, 858 (App. Ct. 1950); Comment: 27 Harv. L. Rev. 593, 594 (1914).
The "further acts" doctrine has been disregarded or rejected in a few significant cases on the theory that the defendant's improperly motivated origination of the process should suffice for liability where the hoped-for injurious or oppressive effect on the plaintiff has in fact eventuated notwithstanding the absence of subsequent overt oppressive acts by defendant. Jackson v. American Telephone & T. Co., 139 N.C. 347, 51 S.E. 1015, 70 L.R.A. 738 (Sup. Ct. 1905); Malone v. Belcher, 216 Mass. 209, 103 N.E. 637 (Sup. Jud. Ct. 1913); Dishaw v. Wadleigh, 44 N.Y.S. 207 (App. Div. 1897), commented on in 11 Harv. L. Rev. 115 (1897). See also the dissent in Melton v. Rickman, supra.
Defendants argue they cannot be liable for abuse of process since nothing that any of them did occurred after the issuance of the arrest warrant on the complaint. There was thus no coercive use of the process against plaintiff after the issuance of process, if at all. This seems to be true except to the extent, as plaintiff argues, that McGinnis' assertedly harassive attempt to serve the warrant at the home of plaintiff's parents was subsequent to its issuance. As to whether that action can be regarded as coercive or otherwise an abuse of the process, see infra.
Plaintiff challenges the "further acts" doctrine and argues for its abrogation insofar as it would bar recovery here. We have concluded, however, that it is not necessary for us to decide whether the requirement of further acts is or should continue to be the law of this State. We are unable, giving plaintiff every legitimate inference from his proofs, to find any abuse of process by any of these defendants, whether with regard to the institution of the criminal complaint and the issuance of the arrest warrant or as to any later acts of any of the defendants. Moreover, in answer to plaintiff's plea that defendants should be held liable, on the merits, whether *132 or not liability can be predicated on abuse of process, as such, because their conduct constituted a willful injury to plaintiff, our response is that we can find no tenable theory on which to hold that defendants' conduct is actionable at all.
We do not, of course, condone LaPlaga's advice to Mrs. Keller, as he was "taught," that a criminal complaint is a proper method of securing restitution on a bad check; nor Clerk Apel's taking a signature on a blank form of criminal complaint. But we find neither of these acts to be, or to be part of, any abuse of process by those persons directed against plaintiff. An irregularity is not necessarily a tort. Further, while there was ample evidence of Ellmyer's personal gratification at plaintiff's discomfiture over the bad check charge and of his private interest in seeing plaintiff indicted thereon, we find no evidence of conduct by Ellmyer which can in any sense be taken as abuse of the process attendant upon Mrs. Keller's complaint against plaintiff.
It seems to us that everything which any of the defendants did in this matter is consistent with an intention thereby to perform their respective duties in the police department and court clerk's office, and this notwithstanding the solicitude shown by LaPlaga and Ellmyer for Mrs. Keller's comfort and convenience. That she was transported back and forth to make it convenient for her to file the complaint; that she was taken for advice on her accident case to Mr. Ferenczi; and that she was given information on how to get a school crossing job  all spell out, at most, a desire by Ellmyer, and, possibly by LaPlaga, to be pleasant to one who was prosecuting a complaint against plaintiff. But these acts are not relevant to any improper or ulterior motivation in the filing of the complaint, which on the proofs was a matter entirely of Mrs. Keller's own volition. Nor did Ellmyer or LaPlaga do anything after the complaint was filed and the warrant was issued to oppress or bring compulsion to bear on plaintiff in respect of this complaint.
McGinnis' attempt to find plaintiff at his parents' home to serve the arrest warrant cannot reasonably be inferred to *133 have been an oppressive act in abuse of the warrant. The testimony indicates he thought plaintiff was "supposed" to be there because of his father's illness. What he told the mother about "Bill" being in "big trouble" was in response to her question as to what was the trouble. It would be sheer speculation to conclude that McGinnis was there to harass or coerce plaintiff or that Ellmyer had sent him there (if at all) for that purpose.
The actions of all of the defendants were taken in the course of their duties, respectively, to prosecute a law violator on a citizen's complaint (as to the police personnel) and to process a criminal complaint in the municipal court (as to the court clerk). Irregularities in the manner of performance of these duties cannot be equated with "abuse of process" in the tort sense. It would be dangerous, in our view, to expose police and judicial-staff personnel to tort liability in connection with the performance of their official duties on the basis of private animosities or hostile personal or political relationships existing between any of them and the fortuitous subject of their official activities in a particular case.
A fortiori, there is no reasonable basis to permit a jury to find that defendants collectively engaged in any conspiracy to harm the plaintiff.
Judgment affirmed.