962 A.2d 532 (2009)
404 N.J. Super. 415
Harold M. HOFFMAN, individually and in behalf of the class of purchasers of product marketed on the websites Asseenontv.com and Seenontv.com, Plaintiff-Appellant/Cross-Respondent,
v.
ASSEENONTV.COM, INC., Defendant-Respondent/Cross-Appellant.
No. A-1840-07T1
Superior Court of New Jersey, Appellate Division.
Argued November 17, 2008.
Decided January 5, 2009.
*533 Harold M. Hoffman, Roseland, appellant/cross-respondent, argued the cause pro se.
Erika N.D. Stanat (Harter Secrest & Emery) of the New York Bar, admitted pro hac vice, argued the cause for respondent/cross-appellant (Cole, Schotz, Meisel, Forman & Leonard, attorneys; Edward Sun Kiel and Ms. Stanat, on the brief).
Before Judges CARCHMAN, R.B. COLEMAN and SIMONELLI.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
Plaintiff Harold Hoffman, an attorney, ordered a product on the internet from defendant-retailer AsSeenOnTV.com. His order prompted his taking advantage of defendant's advertised "free bonus" offer. To pay for the order, plaintiff proffered his American Express credit card, following which defendant confirmed the order on-line, and American Express "approved" the charge. As part of the confirmation process, however, plaintiff was advised that he was being billed an additional shipping and handling charge of $7.95 for the "free bonus." The next day, plaintiff filed a putative class action alleging common law and consumer fraud against defendant, premised on defendant's deceitful advertising of its products on the internet.
Unbeknownst to plaintiff, the products he selected were on backorder and not presently available. Having learned of the *534 pendency of the lawsuit, defendant cancelled the order and never sought payment or actual transfer of funds. Plaintiff never paid for the order, and his credit card was never debited for the charge.
Defendant filed a counterclaim for abuse of process after it learned that plaintiff had filed numerous similar actions against retailers advertising "free bonus" offers. Defendant alleged plaintiff regularly filed such suits seeking to prompt defendants to settle under threat of a potential class action certification.
On a motion for summary judgment, Judge Martinotti in the Law Division dismissed plaintiff's fraud claims, concluding that plaintiff did not establish an ascertainable loss. The judge also dismissed the counterclaim because defendant had not established plaintiff's malicious use or perversion of legal process. Both sides appeal, and we affirm.

I.
We expand on our discussion of the relevant facts. Defendant, a website operator and retailer operating AsSeenOnTV.com, as part of its internet marketing, advertised on the website, a "free bonus gift or offer" with an "initial retail purchase." Included in small type at the bottom of the webpage and next to three asterisks, was the following:
Initial retail purchase is required for qualifying bonus gift or offers, along with a separate shipping and handling charge for each bonus gift or offer added to a shopping cart order(s). Bonus gifts or offers are excluded from any shipping discounts.
On June 11, 2007, plaintiff accessed defendant's site and proceeded to place an order for the purchase of a "Smart Light" for $29.95. After plaintiff made his selection, the screen reflecting his "shopping cart" contents prompted plaintiff to "[c]hoose your free bonus gift or offer."
Beneath that bold-type print were pictures of nine items with brief descriptions. Included under the descriptions for each was an indication of its dollar "value," along with the phrase, "Pay only the cost of S & H." Plaintiff selected as his bonus item a "Free Facial Trimmer" with a represented "$20 Retail Value."
Using his American Express card, plaintiff completed the website's online payment section. At the end of the payment process, the screen indicated "secure checkoutcompleted," thanked plaintiff for his order and indicated:

Processing Credit Card Information ...
Approved
Your order number is [xxxxxxxx]
The following charges will appear on your credit card statement:
$44.85 to SEENONTV.COM[1]
A receipt of your order has been automatically mailed to you.
As a special offer we are giving you a free membership.

Member Number: [xxxxx]
....
At the bottom of the screen was the statement: "Here is [the] order information for your records." The information, in chart form, listed: 1) one facial trimmer, as a "free bonus offer," and that an "initial purchase [was] required" but that he was being charged "$0.00"; 2) one Smart Light, for $29.95; 3) a "Subtotal" of $29.95; 4) a "Shipping (Standard)" charge of $14.90; 5) that there was zero "tax"; and *535 5) a "total" of $44.85. The $14.85 shipping charges on plaintiff's account reflected shipping of $6.95 for the Smart Light, and $7.95 for the facial trimmer.
Although not germane to the ultimate issue on appeal, defendant asserts that the items were not delivered because they were on back order and not available although it concedes that plaintiff appeared on the "do not sell" list. Plaintiff claims that the items were not sent solely because of the "do not sell" designation. Critically important, however, is that the products were never delivered, and defendant cancelled plaintiff's order.
The dispute centered around the effect of the "charge" for the order. In particular, plaintiff provided a copy of an email from American Express indicating that "there was a charge approved on your American Express account ending in [xxxxx] for 44.85 from As Seen on TV. The approval was posted on 06/11/07." Defendant counters by relying on a later email from American Express including the additional representation that "[t]he charge never appeared on the statement."
To explain why plaintiff was never "charged" for the June order, Charles Venniro, defendant's warehouse manager proffered that upon receiving the order, defendant "contacted USA E-Pay, a liaison between [defendant] and American Express, to request `authorization' for [plaintiff's] credit card." Venniro said an "authorization" "merely requests information from American Express" through USA E-Pay "as to whether [plaintiff] had credit available in his card in the amount of the proposed transaction." American Express then "authorized" that plaintiff "had the appropriate amount of credit available on his credit account," and this "`authorization' was posted to [plaintiff's] credit card," on June 11, 2007. Next to the word "status" in the authorization also appeared the phrase "Authorized (Will not be captured)." Venniro explained that in that context, "captured" would mean that defendant "has requested to charge the credit card for the transaction, American Express will charge the credit card for the transaction, and American Express will provide appropriate funds to" defendant. "Will not be captured," on the other hand, as appeared here, meant that defendant "merely requested information as to whether [plaintiff] had the amount of the transaction available on his credit card and did not request that American Express charge [plaintiff's] credit card or request that American Express provide funds to" defendant.
According to defendant, it "never sought to charge" plaintiff's credit card, and in fact defendant routinely did not seek to charge a credit card "until it release[d] the products for delivery to the purchaser." Also, defendant never contacted American Express thereafter to "cancel or reverse a charge" on plaintiff's account, given that defendant never requested such a charge nor released to plaintiff the products plaintiff ordered on June 11. Nothing more was provided by plaintiff to establish that he was either charged or that he had a finite credit limit with American Express that was impacted by this transaction.
Subsequent to this incident, defendant changed its website as it related to the "bonus offer." Defendant changed the language "Choose your free bonus gift or offer" and "Pay only the cost of S & H," to "`Choose your bonus gift or offer'" and "`Just pay separate $7.95 processing.'"[2]
*536 In support of his damage claim, plaintiff submitted the certification of his proposed expert, consultant Alan J. Salzberg, a Ph.D. in statistics. In Salzberg's opinion, plaintiff suffered a "measurable economic loss" in connection with placing his order, because at the time it "authorized" the transaction American Express "reduc[ed] plaintiff's available credit line, or purchasing limit" by the amount of the order. Salzberg's opinion was not changed by the fact that the transaction "did not result in an actual charge to plaintiff's credit card account," and for purposes of the opinion he assumed that "no purchases were denied" by American Express by virtue of the "diminution in [plaintiff's] credit line/purchasing limit." Salzberg's opinion neither identified the credit line nor described the nature of the "measurable economic loss."
In support of its cross-motion, defendant submitted the certification of its counsel who asserted that since May 2007, plaintiff had filed "at least four dozen complaints" against various entities making "virtually identical allegations of consumer fraud." In each case, plaintiff had ordered "relatively low-priced home and personal products" from different internet vendors. Citing examples, counsel asserted that plaintiff clearly was not deceived by defendant's ads in this case, but rather initiated his suit as part of an ongoing plan to file class action fraud complaints and, "before seeking certification, to demand a large sum from the defendants to settle with him alone."
In this case, plaintiff had a settlement demand of $100,000. Counsel said that defendant's investigation had revealed that "nearly all of these [other] defendants did, in fact, yield to [plaintiff's] extortion tactics and [paid] him off." But she was aware of no case in which plaintiff had actually received class certification.
According to counsel, during negotiations with plaintiff, he threatened to "bring new lawsuits against [defendant] for its unwillingness to yield to extortion." In October 2007, moreover, using a different name and address, plaintiff succeeded in ordering from defendant another of its products, a supplement called CialaPren represented as a male enhancement. A few days after obtaining that product, plaintiff filed a new class action against defendant for fraud in connection with that transaction.
Subsequent to the filing of the complaint, defendant changed the language on its website related to the "bonus" offer. Defendant changed the language "Choose your free bonus gift or offer" and "Pay only the cost of S & H," to "Choose your bonus gift or offer" and "`Just pay separate $7.95 processing.'"

II.
We first address what we consider to be the dispositive issue on plaintiff's appeal whether plaintiff demonstrated that he had suffered an ascertainable loss. Plaintiff frames the issue by asserting that "the diminution of an individual's available credit [is] a measurable economic loss." Plaintiff argues that his loss is reflected by his credit limit being reduced by the amount of the orderapproximately $45.00.
*537 We begin our analysis by restating basic principles informing our consideration of the issue.
The Consumer Fraud Act, N.J.S.A. 56:8-1 to -20 (the Act or CFA), is intended, among other things, to stop unlawful merchandise and real estate sales and advertising practices aimed at consumers. D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J.Super. 11, 22-23, 501 A.2d 990 (App. Div.1985). See also Finderne Mgmt. Co. v. Barrett, 402 N.J.Super. 546, 566, 955 A.2d 940 (App.Div.2008) ("The legislative concern was over sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices."); Vort v. Hollander, 257 N.J.Super. 56, 61-62, 607 A.2d 1339 (App.Div.) ("The purpose of the Consumer Fraud Act was to prevent deception, fraud or falsity, whether by acts of commission or omission, in connection with the sale and advertisement of merchandise and real estate.") certif. denied, 130 N.J. 599, 617 A.2d 1221 (1992). The Act provides in relevant part:
[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice;
[N.J.S.A. 56:8-2]
Relief can be afforded to "[a]ny person[:]"

who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act.
[N.J.S.A. 56:8-19 (emphasis added).]
We have previously defined ascertainable loss as "occur[ing] when a consumer receives less than what was promised." Thiedemann v. Mercedes-Benz U.S.A., LLC, 183 N.J. 234, 244, 872 A.2d 783 (2005) (citing Union Ink Co., Inc. v. AT&T Corp., 352 N.J.Super. 617, 646, 801 A.2d 361 (App.Div.), certif. denied, 174 N.J. 547, 810 A.2d 66 (2002)). See also Romano v. Galaxy Toyota, 399 N.J.Super. 470, 479, 945 A.2d 49 (App.Div.), certif. denied, 196 N.J. 344, 953 A.2d 763 (2008).
Plaintiff urges two primary reasons why the motion judge erred by finding that the diminution in plaintiff's credit limit was not an ascertainable loss: 1) he failed to take into account the merits of his expert's contrasting opinion; and 2) he failed to respect that the concept of "ascertainable loss" goes beyond mere "out-of-pocket" losses and includes diminution in "value."
With respect to the former, however, plaintiff's expert, Salzberg, assumed for purposes of his opinion that the transaction did not result in an actual charge to plaintiff's account, and that "no purchases were denied by American Express by virtue of the $45 diminution in [plaintiff's] credit line/purchasing limit." He provided no explanation for how, with these acknowledged facts, plaintiff has suffered an ascertainable loss.
Instead, he made unsupported conclusions that "under the facts presented to a reasonable degree of certainty," plaintiff had suffered "actual economic loss on June 11, 2007," and that plaintiff's "loss is measurable." Although he added that he had "double-check[ed]" his conclusions by the *538 market pricing and statistical expectations approaches, such confirmations were meaningless without an explanation of exactly how he determined plaintiff's loss was measurable in the first place. Even presuming that Salzberg totaled plaintiff's damages at approximately $45.00the amount of the orderhe still failed to explain the basis for that conclusion. Salzberg never considered that the order was never billed or sent, nor that plaintiff's credit account was never debited. He further failed to consider that plaintiff never claimed that the diminution in his credit "limit" caused him to forego some other desired purchasing opportunity, or caused him to suffer a rejection by American Express of some purchase he had made not realizing there had been a temporary diminution in his credit limit. In fact, plaintiff conceded at oral argument that nothing in the record supports the critical assumption that American Express imposed any credit limit on plaintiff's purchases or use of the card.
Salzberg's omissions were critical, because "conclusory and self-serving assertions" in certifications without explanatory or supporting facts will not defeat a meritorious motion for summary judgment. Puder v. Buechel, 183 N.J. 428, 440, 874 A.2d 534 (2005) (citing Martin v. Rutgers Cas. Ins. Co., 346 N.J.Super. 320, 323, 787 A.2d 948 (App.Div.2002); Brae Asset Fund, L.P. v. Newman, 327 N.J.Super. 129, 134, 742 A.2d 986 (App.Div. 1999)). Competent opposition requires "competent evidential material" beyond mere "speculation" and "fanciful arguments." Merchs. Express Money Order Co. v. Sun Nat'l Bank, 374 N.J.Super. 556, 563 (App.Div.), certif. granted, 183 N.J. 592, 874 A.2d 1109 (2005); O'Loughlin v. Nat'l Cmty. Bank, 338 N.J.Super. 592, 606-07, 770 A.2d 1185 (App.Div.) (opponent must do more than establish abstract doubt regarding material facts), certif. denied, 169 N.J. 606, 782 A.2d 424 (2001). See also James Talcott, Inc. v. Shulman, 82 N.J.Super. 438, 443, 198 A.2d 98 (App.Div.1964) (noting that "[m]ere sworn conclusions of ultimate facts, without material basis or supporting affidavits by persons having actual knowledge of the facts, are insufficient to withstand a motion for summary judgment").
There is, however, a more fundamental flaw in the expert's opinion. The Court has defined "ascertainable loss" to mean "an actual loss." Thiedemann, supra, 183 N.J. at 248, 872 A.2d 783. The loss "must be presented with some certainty demonstrating that it is capable of calculation, although it need not be demonstrated in all its particularity to avoid summary judgment." Ibid. But a plaintiff "must produce evidence from which the fact finder could find or infer that the plaintiff suffered an actual loss." Ibid. And the "certainty implicit in the concept of `ascertainable' loss is that it is quantifiable or measurable," even if it had yet to be "experienced as an out-of-pocket loss." Ibid. Nothing presented here, beyond a conclusory statement, provides any support for Salzberg's opinion that plaintiff's ascertainable loss was calculable, or that an authorization was a diminution in value.
Even assuming, moreover, that the authorization was at least a temporary hold on plaintiff's credit card in the approximate amount of $45.00, plaintiff himself failed to assert that such a hold impacted his credit limit in a way that damaged him. In fact, at oral argument, he conceded that he had not offered anything to suggest that his American Express charging privileges were in some manner limited to any extent, a key component in suggesting that defendant's conduct impacted on his availability of credit.
In sum, plaintiff was never charged for the items he ordered in June 2007; to the *539 extent his credit card company authorized credit for the order, the authorization did not cause him to suffer any loss, and both he and his expert failed to identify any actual loss or damage he experienced as a result of the entire attempted transaction. See Perkins v. DaimlerChrysler Corp., 383 N.J.Super. 99, 106-07, 890 A.2d 997 (App. Div.2006) (reasoning from Thiedemann, we affirmed dismissal of a CFA complaint where the allegedly substandard vehicle part did not fail or require repair or replacement during the warranty period, so there was no ascertainable loss); Laufer v. U.S. Life Ins. Co., 385 N.J.Super. 172, 187, 896 A.2d 1101 (App.Div.2006) (noting that "[t]he plaintiff must be able to present sufficient evidence of [ascertainable] loss to survive a motion for summary judgment").
In rejecting plaintiff's ascertainable loss argument, the motion judge also found instructive the New Jersey Supreme Court's decision in Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475 n. 4, 541 A.2d 1063 (1988). In Meshinsky, the plaintiff failed to make timely boat payments when the boat developed various mechanical problems. These non-payments may have subsequently impacted the plaintiff's credit report. The Court noted, however, that at a point when the plaintiff was rejected for another loan, his credit report showed not only his delinquencies on the boat loan, but two judgments against him, and other overdue balances and late payments. Because plaintiff eventually succeeded in receiving that additional financing, he did not prove that he had suffered a loss at the defendant's hands with respect to his credit report and the prior boat loan.
Plaintiff attempts to distinguish Meshinsky by claiming that his loss was quantifiable. As we have noted, nothing in the record supports either the claim or the quantification of that loss.
Plaintiff also relies on Cox v. Sears Roebuck & Co., 138 N.J. 2, 23, 647 A.2d 454 (1994). In Cox, the plaintiff had incurred a debt for home repairs under a contract with Sears by which Sears also had a recorded lien on the plaintiff's property. The Court concluded that "an improper debt or lien against a consumer-fraud plaintiff may constitute a loss" under the Act, yet it found that the debt and lien themselves were not Act violations, while other actions by Sears may have been. Ibid.
Plaintiff's reliance on Cox is misplaced. The authorization on his American Express account is neither a debt nor a lien, and as Venniro explained the authorization was not a "charge" since it was not captured or ultimately charged to plaintiff's account.
Plaintiff's reliance on Dabush v. Mercedes-Benz USA, LLC, 378 N.J.Super. 105, 116, 874 A.2d 1110 (App.Div.), certif. denied, 185 N.J. 265, 883 A.2d 1062 (2005), is also misplaced. In Dabush, the plaintiff-lessee of a motor vehicle appealed the trial court's dismissal of his CFA class action suit against the manufacturer. Plaintiff could not establish an ascertainable loss when the vehicle's on-board navigation system failed to operate within the coverage area as represented, and the plaintiff was late arriving at a business meeting as a result. Plaintiff did not lose any "money or business due to his late arrival," and we affirmed the trial court's grant of summary judgment to the manufacturer. Id. at 111, 124, 874 A.2d 1110. Although we noted that "a plaintiff need not actually expend a sum of money as a result of defendant's unlawful consumer practice in order to demonstrate a loss," we nevertheless affirmed that "the amount of the loss must be ascertainable and must be established with reasonable certainty." Id. at 116, 874 A.2d 1110. Plaintiff had the burden of showing the connection between *540 the improper practice and the ascertainable loss. Ibid. Like the aggrieved party in Dabush, plaintiff has failed to meet that burden so as to withstand a motion for summary judgment.
We likewise reject as unsubstantiated, plaintiff's claim that he suffered a loss because defendant sold his "personal information" to "its marketing partners," a type of "commercial exploitation" that he contends also satisfy the ascertainable loss standard. While the website made reference to defendant's reservation of rights to distribute such information, the record is barren of any proof that such distribution took place or that it amounts to an "ascertainable loss." This becomes most significant given the unusual facts of this case, including the premature cancellation of the order prior to fulfillment. We find no merit in this claim.
We reach the same result as to the common law claim. Judge Martinotti rejected plaintiff's common law fraud claim because plaintiff failed to establish how he had relied to his detriment on defendant's misrepresentation. Specifically, the judge relied on his earlier reasoning and found that plaintiff actually had not suffered any loss or diminution in "purchasing power" or "reduction in credit limit" as a result of the credit card authorization. He stated it was "unbelievable" that in October "plaintiff relied on the misrepresentations he alleged existed in June."
Common law fraud requires a material misrepresentation of a presently existing or past fact, knowledge or belief by defendant in its falsity, defendant's intention that the plaintiff rely on it, reasonable reliance by plaintiff, and damage. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997). See also Triffin v. Automatic Data Processing, Inc., 394 N.J.Super. 237, 246, 926 A.2d 362 (App.Div.2007); Port Liberte Homeowners Ass'n v. Sordoni Const. Co., 393 N.J.Super. 492, 507 (App.Div.), certif. denied, 192 N.J. 479, 932 A.2d 30 (2007).
Plaintiff says that his receipt or non-receipt of the product was irrelevant to his common law fraud claim, because the damage he suffered was "by virtue of the unconsummated purchase which defendant unilaterally canceled."
Rather, he says the fraud claim was proven by: defendant's misstatement that he would receive a "free" product when defendant knew it was not "free"; defendant's knowledge of the statement's falsity; and plaintiff's reliance on it to his detriment in the form of a "diminution in credit available" or by dint of the "uncompensated exploitation of plaintiff's personal property[,]" by which he means the information he provided at defendant's behest ordering from defendant's site.
Our analysis as to the absence of ascertainable loss applies with equal force here. Plaintiff has failed to establish any damage or loss, regardless of any reliance. Plaintiff's claim, without authority, that a common law fraud claim has a lesser standard of proof of damage than a consumer fraud claim is not persuasive. Even if such standard does exist, plaintiff's claim still fails as he suffered no damage.
We likewise reject his claim that when he ultimately purchased the product, he was relying on defendant's earlier website and its promotion of a free gift. Not only had defendant changed its website, it clearly described the actual charges incurred. This was the information informing plaintiff at the time of sale and nothing in the record suggests misrepresentation. Plaintiff concedes that he knew about the changes, and he does not say that as of October, the ads were still deceiving. We find plaintiff's argument disingenuous as his complaint had been filed prior to the time of the subsequent purchase. The motion judge correctly dismissed the common law fraud claim.

*541 III.

Finally, we reject defendant's cross-appeal and its claim that the judge erred in dismissing its abuse of process claim. Its claim is premised on the underlying observation that this suit was "merely one of scores of nearly identical lawsuits commenced by a lawyer who deliberately trolled the internet for retailers against whom he might file `class action' lawsuits," only to generate a quick settlement on his own behalf prior to seeking a class certification that he never intended to seek.
In granting plaintiff summary judgment on defendant's abuse of process counterclaim, the motion judge said he disagreed that "plaintiff's action is meritless." Although he acknowledged having granted defendant summary judgment on all plaintiff's claims, he nonetheless found that plaintiff "has brought this action without malice and with a sincere belief that his claim did have merit."
Moreover, the judge disagreed with defendant that plaintiff's actions during settlement negotiations or discussions indicated an "ulterior motive" or malicious intent. He also found no evidence that plaintiff had actually "invoke[d]" the court's process wrongfully, because none "of the lawsuits [defendant accused plaintiff of filing] were as a result of settlement discussions breaking down."
We first observe that defendant's claim was for malicious abuse of process rather than malicious use of process. The distinction between these causes of action precludes defendant's counterclaim. Our focus must not be on what prompted the suit but what action plaintiff engaged in after commencement of the action.
The tort of malicious abuse of process lies not for commencing an improper action, but for misusing or misapplying process after it is issued. Baglini v. Lauletta, 338 N.J.Super. 282, 293, 768 A.2d 825 (App.Div.), certif. denied, 169 N.J. 607, 782 A.2d 425 (2001). To be found liable for malicious abuse of process, a party must have performed additional acts "after issuance of process `which represent the perversion or abuse of the legitimate purposes of that process.'" Id. at 294, 768 A.2d 825 (citation omitted). We have further clarified that "process is not abused unless after its issuance the defendant reveals an ulterior purpose he had in securing it by committing `further acts' whereby he demonstrably uses the process as a means to coerce or oppress the plaintiff." Ruberton v. Gabage, 280 N.J.Super. 125, 130, 654 A.2d 1002 (App.Div.) (quoting Tedards v. Auty, 232 N.J.Super. 541, 550, 557 A.2d 1030 (App.Div. 1989) (quoting Gambocz v. Apel, 102 N.J.Super. 123, 130, 245 A.2d 507 (App.Div.), certif. denied, 52 N.J. 485, 246 A.2d 447 (1968))), certif. denied, 142 N.J. 451, 663 A.2d 1358 (1995). In order for there to be "abuse" of process, therefore, a party must "use" process in some fashion, and that use must be "coercive" or "illegitimate." Ruberton, supra, 280 N.J.Super. at 130-31, 654 A.2d 1002 (quoting Penwag Prop. Co. v. Landau, 148 N.J.Super. 493, 499, 372 A.2d 1162 (App.Div.1977), aff'd, 76 N.J. 595, 388 A.2d 1265 (1978)).
Plaintiff filed his initial complaint on June 12, 2007; plaintiff's filing of numerous earlier suits that defendant denominates similar to this one is irrelevant to its cause of action. As we have noted, defendant did not allege malicious use of process. See Baglini, supra, 338 N.J.Super. at 294, 768 A.2d 825 (citing Ash v. Cohn, 119 N.J.L. 54, 58, 194 A. 174 (E. & A. 1937)) (noting that malicious use of process involves "employment of process for its ostensible purpose, although without reasonable or probable cause, whereas the malicious abuse is the employment of a process in a manner not contemplated by law"). See also Earl v. Winne, 14 N.J. 119, 128, 101 A.2d 535 (1953).
*542 Defendant claims that plaintiff's threats to file more litigation while he was involved here, and his subsequent making good on those threats by filing the male-enhancement suit against it, were all evidence of "further acts" demonstrating plaintiff's use of process to coerce. In that regard, defendant's accusation that plaintiff filed this suit as a putative class action while never intending to seek class certification is arguably relevant. An intent to threaten the defendant with process one never intended to pursue might satisfy the abuse-of-process tort, because maliciously threatening process in an existing case could be as unfairly coercive as abusing process in some more direct way. See Ruberton, supra, 280 N.J.Super. at 130, 654 A.2d 1002 (observing that abuse of process includes "further acts" intended to coerce or oppress a party).
Here, however, the statements and many of the actions forming the basis of defendant's abuse-of-process complaint occurred during or in the context of the parties' ongoing settlement discussions, and those negotiations were not part of a court "process." See id. at 130-32, 654 A.2d 1002 (holding that a statement by counsel in settlement conference threatening criminal prosecution was not considered an abuse of process, because the settlement conference was not part of "process" counsel had caused to issue, and counsel demonstrated no further actions of an intent to use the settlement conference scheduling order to coerce).
Defendant provided evidence that plaintiff had filed "over 40 purported class-action, consumer fraud lawsuits in Bergen County," most all of which plaintiff prosecuted with a similar pattern of demanding a "large sum from defendants to settle with him alone" before he sought class certification. Our concern with reliance on this proffered information is that, as represented by counsel, many of these suits were settled before class certification could be attempted or achieved, and we are in no position to nor will we assess the bona fides of those actions or any other extant matters. Likewise, we are in no position to determine why each defendant settled these matters if such matters presented no form of exposure to them. Defendant's claim that plaintiff is engaged in a form of "extortion" carries little weight on this record. We find no merit in defendant's counterclaim and the motion judge properly dismissed this entire action.
We affirm the dismissal of the complaint and counterclaim.
NOTES
[1] At various times, the website is referred to "AsseenonTv.com," "As Seen On TV" or "SeenonTv."
[2] According to Venniro, on October 25, 2007, four months after plaintiff's initial attempt to purchase, after the change in the website and while his suit was pending, plaintiff "used information different from the information that he provided in connection with the June 11, 2007, order" in placing a new order for a Smart Light with the Facial Hair Trimmer as a free bonus. Defendant processed the order and sold plaintiff those items. The new order was shipped to plaintiff on October 29, 2007. Plaintiff acknowledged that in October 2007, he placed an order for the same items as before, this time receiving the Smart Light and the trimmer, and being billed $44.85.