**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2641-21

MALCOM A. ISLER,

    Plaintiff-Appellant,

v.

THE HOUSING AUTHORITY
OF THE CITY OF CAMDEN and
VICTOR D. FIGUEROA,

    Defendants-Respondents.

_____

          Argued October 25, 2023 – Decided November 14, 2023

          Before Judges Mayer and Enright.

          On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-3547-19.

          Ian M. Bryson argued the cause for appellant (Derek Smith Law Group, PLLC, attorneys; Ian M. Bryson, on the briefs).

          Louis R. Lessig argued the cause for respondents (Brown & Connery, LLP, attorneys; Louis R. Lessig and Andrew S. Brown, on the brief).

PER CURIAM

Plaintiff Malcom Isler appeals from a March 18, 2022 order granting summary judgment to defendants the Housing Authority of the City of Camden (HACC) and Victor D. Figueroa, and dismissing plaintiff's claims under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -50, with prejudice. We affirm, substantially for the reasons set forth in Judge Daniel A. Bernardin's comprehensive written opinion.

I.

We glean the following facts from the motion record. The HACC hired plaintiff in 2000. He served in various positions in the HACC and in 2016, he became the Director of Asset Management. He resigned from that position on February 22, 2019. At all relevant times, plaintiff was the only Black male department director at HACC.

According to Figueroa, HACC's Executive Director, plaintiff's responsibilities as Director of Asset Management included:

> direct oversight of the property managers to ensure that they were . . . fulfilling their obligations, such as collecting the rent, turning units over from vacancy to occupancy within [twenty] to [thirty] days, [and] making sure that the occupancy rate stayed above a certain level required by [the United States Department of Housing and Urban Development (HUD)].

On January 16, 2019, plaintiff filed a workplace complaint entitled "Employee Complaint for Hostile Work Environment/Workplace Discrimination," and delivered it to his immediate supervisor, Kathryn Blackshear, HACC's Deputy Executive Director. In his complaint, plaintiff stated he was "frustrated, angry, disheartened and . . . fe[lt] anxiety" when reporting to work. He also alleged he was subjected to a hostile work environment and discrimination by Figueroa, stating:

> In the past and . . . lately, I am constantly made the subject of unwarranted reprimands, . . . micromanaged and treated much differently than my other middle-aged non-black department directors. This has caused a r[]ise in my stress level and [a] change in my demeanor; which in turn, is affecting my office staff, as they see the [nit-]picking and actions to try to discredit me and call into question my work ethic[] and ability to perform my duties. . . . It has become a personal witch-hunt towards me[,] and this treatment is unfair and one-sided.
>
> . . . .
>
> . . . I am often tried and convicted before I ever have an opportunity to respond or give clarification, which I have continuously brought to the attention of the Executive Director. For example, the collection of rent for public housing properties is being questioned. Recently, immediately after a personnel meeting, . . . the [E]xecutive [D]irector brought up the issue of rent collection and that there was $300[,000] of uncollected rent. I disagreed, noting that there [were] delinquent accounts[,] and the property managers [were] aware of

3

how to handle them. . . . The temperament after my responses[] gave me a strong feeling that an opinion and mindset had already been made up, before the subject was discussed. To this day, I have not been brought in to ask about rent collection procedures or actual financials, nor the opportunity for a corrective action plan to be developed and implemented[,] if needed. The whispers and rumor mill of HACC, which always pan[] out [to be] true, is that I am negligent in my duties and that the Executive Director, who I only met with informally once, wants me disciplined.

On January 18, 2019, at approximately 10:30 a.m., Figueroa and John Kostyal, HACC's Human Resource Manager, met with plaintiff and suspended him for twenty days without pay, based on plaintiff's failure to oversee the collection of $39,680 in unpaid rents and late fees from various tenants at one of HACC's public housing complexes. Figueroa advised plaintiff that a review of tenant accounts receivables from other HACC sites showed over $348,000 in additional rents also remained uncollected. The notice of disciplinary action listed the formal reasons for plaintiff's suspension as: "[u]nprofessional behavior, [c]onduct [u]nbecoming an HACC employee, [i]nsubordination, [n]eglect of [d]uty, [i]ncompetency, [i]nsufficiency and [f]ailure to [p]erform [d]uties, [p]oor [j]ob [p]erformance and [o]ther [s]ufficient [c]ause."

Figueroa subsequently testified during a deposition that he did not receive a copy of plaintiff's January 16 employee complaint until after he met with

4

plaintiff on January 18 and imposed the suspension. In fact, Figueroa stated he received plaintiff's complaint from his secretary "around 1:35 p.m." on January 18, and then "read it before [he] date[d] and timestamped it at 2:41 p.m." that day. Kostyal provided similar testimony regarding Figueroa's receipt of plaintiff's employee complaint. Additionally, Kostyal testified the draft version of plaintiff's disciplinary action underwent "multiple changes," with the earliest draft penned on December 17, 2018, one month before plaintiff filed his employee complaint. Kostyal also stated he and Figueroa addressed another draft version of the disciplinary action on January 2, 2019.

During her deposition, Blackshear testified about the timestamp on plaintiff's employee's complaint, which read, "RECEIVED JAN 18, 2019," and included the handwritten notation, "2:41 [p].[m].[,] actually hand delivered at about 1:35 [p].[m]." Blackshear stated "this [was Figueroa's] handwriting." However, Blackshear provided conflicting testimony about whether she gave plaintiff's complaint directly to Figueroa or Figueroa's secretary. At one point, after Blackshear testified that she gave the employee complaint to Figueroa and discussed it with him, she withdrew that testimony, stating, "I get confused and stuff. I handed [the employee complaint] to [Figueroa's secretary]. Whenever

5

she got time, she gave it to [Figueroa]. . . . I remember[] that his door was closed, so I handed it to [Figueroa's secretary]."

Plaintiff testified during his deposition that he "was called down to . . . Figueroa's office" around "10:30 in the morning" on January 18, 2019, and told he was suspended for twenty days without pay. When plaintiff was asked whether he had "specific knowledge" as to whether Blackshear "actually spoke with . . . Figueroa about [the employee complaint] on [January] 16th," plaintiff stated, "I do not have specific knowledge." Plaintiff also was asked if he had "any personal knowledge as to how or in what way [Blackshear] may or may not have shared [plaintiff's employee complaint]" with Figueroa. Plaintiff answered, "I do not, that is correct."

On February 19, 2019, Figueroa informed plaintiff that HACC received multiple allegations about plaintiff that needed to be investigated, including an allegation that he permitted housing applicants to "jump" other people on the waiting list and receive public housing in violation of HUD regulations. Based on these allegations, Figueroa told plaintiff he was going to be placed on paid administrative leave. Two days later, plaintiff resigned, claiming he "bec[a]me a target for unwarranted disciplinary actions, taunting, and race discrimination, [and] all that ha[d] created a hostile work environment." He stated, "[f]or the

6

betterment of my overall health and family obligations, I am unhappily resigning as the Director of Asset Management effective Friday, February 22, 2019."

Plaintiff subsequently applied for, and was denied, unemployment benefits from the State. In rejecting plaintiff's request for benefits, the State explained, "[y]ou voluntarily left your job because you were dissatisfied with your working conditions. You did not exhaust all opportunities to resolve the problems with your employer before leaving. Therefore, your reason[] for leaving does not constitute good cause attributable to the work."

In September 2019, plaintiff filed a four-count complaint against HACC and Figueroa. The first three counts of the complaint alleged defendants violated the NJLAD based on their: (1) discriminatory discharge; (2) hostile work environment; and (3) retaliation. Additionally, plaintiff alleged defendants violated his equal protection rights under the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2. The parties subsequently entered into a stipulation, dismissing the NJCRA claim with prejudice.

Upon the completion of discovery, defendants moved for summary judgment. Judge Bernardin heard argument on the motion and entered an order on October 29, 2021, denying defendants' application. Defendants moved for reconsideration. On March 18, 2022, Judge Bernardin conducted argument on

the motion and acknowledged he "did not properly assess [plaintiff's NJLAD claims under] McDonnell[]Douglas"[1] before signing the October 29 order. Later that day, he issued an order, granting defendants summary judgment and dismissing plaintiff's remaining claims with prejudice.

In a thoughtful written opinion accompanying the March 18 order, Judge Bernardin concluded plaintiff's discriminatory discharge claim was "based entirely on his subjective belief that Figueroa treated him differently than other department directors because none shared the same protected status as [p]laintiff." The judge found plaintiff provided no "evidence linking an adverse employment action to his race, color or sex." Further, the judge determined "defendants state[d] a legitimate non-discriminatory reason for any adverse employment action," specifically, "the serious offense of failure to oversee rent collection[,] resulting in $348,749.45 in uncollected rent and fees." Moreover, the judge found plaintiff did not establish "the reason for discharge was pretextual and that discriminatory intent played a role in his discharge."

Turning to plaintiff's hostile work environment claim, the judge found this claim stemmed from plaintiff's "dissatisfaction with Figueroa's management

---

[1] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).

style as [E]xecutive [D]irector." The judge concluded, "claims of close supervision and micromanagement do not constitute an adverse employment [action] under the [NJ]LAD," and "[a] reasonable jury could not, as a matter of law, find that [p]laintiff's workplace was permeated with discriminatory intimidation, ridicule and insult that [was] sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment."

Finally, Judge Bernardin addressed plaintiff's retaliation claim, finding it was grounded in plaintiff's belief that Figueroa received his employee complaint before he suspended plaintiff on January 18, 2019. The judge determined that while plaintiff averred he handed his employee complaint directly to Blackshear on January 16, 2019, Blackshear's deposition testimony "about when she received the complaint and what she did with it after receipt" was "vague and uncertain." Additionally, the judge found plaintiff presented no competent evidence to refute Figueroa's testimony that he received the complaint from his secretary on the afternoon of January 18 and read it at 2:41 p.m. that day, as evidenced by the timestamp and Figueroa's handwriting on the document.

Further, the judge stated plaintiff was unable to "establish a link between the filing of the employee complaint and his suspension because defendants planned to suspend plaintiff nearly one month before January 16[ and] . . . began

9

taking affirmative steps to discipline plaintiff as early as December 17, 2019."

The judge continued:

> Drafts of the suspension notice were exchanged between [Figueroa and Kostyal] with the final suspension notice issued to plaintiff on January 18[]. From the "whispers and rumor mill [of HACC,"] plaintiff expected to be suspended. Plaintiff cannot establish that his protected activity played a role in defendant[s'] decision to discipline him on January 18[]. Plaintiff's claim that defendant employer retaliated by opposing his application [for unemployment benefits] is rejected as that state agency applied information received and made an independent decision to deny [plaintiff unemployment benefits].
>
> The competent evidence supports the finding that Figueroa did not know of the [January 16] complaint . . . before issuing discipline. There is no competent contrary [evidence] and no fact issue. Summary [j]udgment on the retaliation claim is granted.

II.

On appeal, plaintiff solely argues the judge "erred in granting summary judgment to defendants because defendants retaliated against plaintiff for complaining about unlawful employment discrimination."[2]   We are not

---

[2]  Because plaintiff does not advance any arguments on appeal regarding the dismissal of his claims for discriminatory discharge or hostile work environment, any argument regarding these claims is deemed waived.

persuaded.

"We review a grant of summary judgment de novo, applying the same standard as the trial court." Norman Int'l, Inc. v. Admiral Ins. Co., 251 N.J. 538, 549 (2022) (quoting Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019)). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 935 (App. Div. 2007)). "[A]n issue of [material fact] is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014) (quoting R. 4:46-2(c)).

---

Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) (citations omitted) ("An issue not briefed on appeal is deemed waived.").

A party does not create a genuine issue of fact simply by offering a sworn statement. Carroll v. N.J. Transit, 366 N.J. Super. 380, 388 (App. Div. 2004). Also, "'conclusory and self-serving assertions' in certifications without explanatory or supporting facts will not defeat a meritorious motion for summary judgment." Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 425-26 (App. Div. 2009) (quoting Puder v. Buechel, 183 N.J. 428, 440 (2005)). "Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'" Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Hoffman, 404 N.J. Super. at 425-26).

In addressing a summary judgment motion, the trial court "must analyze the record in light of the substantive standard and burden of proof that a factfinder would apply in the event that the case was tried." Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016) (citations omitted). Accordingly, "neither the motion court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action." Bhagat, 217 N.J. at 38.

It also is well settled that a trial court's decision to grant a motion for reconsideration should be upheld on appeal unless the decision was an abuse of discretion. Granata v. Broderick, 446 N.J. Super. 449, 468 (App. Div. 2016).

12                                                                            A-2641-21

An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'"  Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

Reconsideration is appropriate in two circumstances:  (1) when the court's decision is "based upon a palpably incorrect or irrational basis," or (2) when "it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence."  Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996) (quoting D'Atria v. D'Atria, 242 N.J. Super. 393, 401 (Ch. Div. 1990)).

Next, we recognize the NJLAD is remedial legislation designed to root out "the cancer of discrimination."  Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 546 (2013) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)).  It prohibits unlawful employment practices and discrimination "based on race, religion, sex, or other protected status, that creates a hostile work environment."  Cutler v. Dorn, 196 N.J. 419, 430 (2008) (citing Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 601 (1993)); see also N.J.S.A. 10:5-12(a).  "Further, it prohibits reprisals against an employee who asserts rights granted by the [NJ]LAD."

Dunkley v. S. Coraluzzo Petroleum Transporters, 437 N.J. Super. 366, 375 (App. Div. 2014) (citing N.J.S.A. 10:5-12(d)).

Trial and appellate courts utilize the three-part test set forth in McDonnell Douglas to analyze NJLAD claims "when there is only 'circumstantial evidence' of [racial] discrimination." Henry v. N.J. Dep't of Hum. Servs., 204 N.J. 320, 330 (2010) (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 446-47 (2005)). Under that burden-shifting test:

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
>
> [Id. at 331 (quoting Dixon v Rutgers, The State Univ. of N.J., 110 N.J. 432, 442 (1988)).]

Based on the McDonnell Douglas methodology, a plaintiff must first "demonstrate that [they] can meet each of the elements of a prima facie case." Victor v. State, 203 N.J. 383, 408 (2010) (citing McDonnell Douglas, 411 U.S. at 802). The elements depend on the nature of the claim asserted. Because plaintiff filed suit against defendants alleging discriminatory discharge, a hostile work environment, and retaliation, we briefly address the nature of those claims.

To establish a prima facie case of discriminatory discharge, a plaintiff

14

must show: "(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job." Id. at 409.

A plaintiff asserting a hostile work environment claim must establish the following "prima facie elements: (1) that plaintiff is in a protected class; (2) that plaintiff was subjected to conduct that would not have occurred but for that protected status; and (3) that it was severe or pervasive enough to alter the conditions of employment." Ibid.

Finally, a plaintiff asserting a claim of retaliation under the NJLAD must establish the following prima facie elements: "(1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence." Ibid.

As we have indicated, "[t]he establishment of the prima face case creates an inference of discrimination [after which] . . . the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's action." Henry, 204 N.J. at 331 (alternation in original) (quoting

15

Zive, 182 N.J. at 449). "Subsequently, 'the burden of production shifts back to the employee to prove by a preponderance of the evidence that the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision.'" Ibid. (quoting Zive, 182 N.J. at 449).

Here, defendants acknowledge: plaintiff is a member of a protected class; his January 16 employee complaint constituted a protected activity; and his unpaid suspension was an adverse employment action. However, they contend Judge Bernardin correctly found plaintiff failed to establish a prima facie case of retaliation under the NJLAD because plaintiff failed to show a causal link between the filing of his employee complaint and his unpaid suspension. We agree.

As the judge noted, plaintiff based his retaliation claim on the belief "Figueroa received the January 16[] complaint before issuing the [twenty]-day suspension," but plaintiff's own deposition testimony reflected he had no direct knowledge of when Figueroa received and reviewed that complaint. Moreover, the judge found: "Blackshear's [deposition] testimony on th[is] issue was vague, inconsistent and contradictory"; her testimony was "not competent"; and "a reasonable jury could not glean from her testimony that Figueroa was aware of the complaint before he suspended plaintiff on January 18." Additionally, as the

judge aptly noted, the deposition testimony from Figueroa and Kostyal confirmed Figueroa did not read the employee complaint until hours after he suspended plaintiff, and Figueroa and Kostyal contemplated disciplining plaintiff approximately a month before plaintiff filed his employee complaint because plaintiff failed to oversee the collection of $39,680 in unpaid rents from one of HACC's public housing complexes and additional rent and late fees totaling over $348,000 remained due. The judge's factual findings are amply supported on the record. Accordingly, his legal conclusion that no genuine issue as to any material fact existed relative to plaintiff's retaliation claim is unassailable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2641-21